**Harold L. MITCHELL, Jr., Plaintiff,**

v.

**Richard E. TENNEY, Pioneer Commodities, Inc., and Agri-Econ, Inc.,
Defendants.**

**No. 85 C 4870.**

United States District Court,
N.D. Illinois, E.D.

Dec. 24, 1986.

Susan N. Sekuler, Robert A. Vanasco, Schwartz & Freeman, Chicago, Ill., for plaintiff.

Linda S. Kagan, Law Offices of Robert E. Zeitner, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Harold L. Mitchell, Jr. ("Mitchell") filed this action against defendants Richard E. Tenney ("Tenney"), Pioneer Commodities, Inc. ("Pioneer") and Agri-Econ, Inc. ("Agri") alleging a federal claim and various pendent state claims. Specifically, Mitchell contends that Pioneer and Tenney discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Mitchell's complaint also includes four separate counts under state law allegedly arising out of the same set of facts which support the Title VII claim.

All defendants joined in filing a motion for summary judgment on the Title VII claim and a motion to dismiss the pendent state claims. The defendants argue that Mitchell was not an employee of Pioneer but an independent contractor. As such, any claim of race discrimination under Title VII must fail, defendants argue, because an employer/employee relationship is a threshold requirement in all Title VII actions. Therefore, defendants state that they are entitled to judgment as to the Title VII claim. Defendants then request dismissal of the pendent state claims for lack of jurisdiction. Because Mitchell's status with Pioneer could be that of an employee, and in any case common law employee status is not a prerequisite for a Title VII plaintiff such as Mitchell, defendants' motion for summary judgment on the Title VII claim is denied. The Title VII claim then provides a basis for this court's jurisdiction over the state claims.

## FACTS

Mitchell's Title VII claim involves discriminatory acts in which Pioneer and Tenney allegedly engaged. Only facts pertaining to the issue of Mitchell's employment relationship with Pioneer are relevant to this summary judgment motion. The parties have engaged in discovery solely on that question. Mitchell's amended complaint sets forth a detailed history of his relationship and association with Pioneer, Agri and Tenney. The depositions of Mitchell and Tenney provide additional facts.

Pioneer is a futures commission merchant ("FCM") registered with the Commodity Futures Trading Commission ("CFTC"). Its principal business activities include (1) buying and selling commodity futures for its customers; (2) investing customer funds, and (3) conducting seminars for customers regarding commodities trading. Pioneer, an Illinois corporation, presently has its corporate headquarters in Florida. At all times relevant to this action Pioneer's principal place of business was in Chicago.

Mitchell began working for Pioneer on April 15, 1977 as an associated person ("AP"). Mitchell described an AP as "one who would take orders from the public and transmit those orders to the floors of the appropriate exchanges" (plaintiff's dep. at 11). Mitchell was licensed with the CFTC as an AP affiliated with Pioneer. As an AP, Mitchell placed orders for Pioneer. He could not place orders in his own name (plaintiff's dep. at 62) or in the name of another FCM (Tenney dep. at 27).

Mitchell performed his duties as AP for Pioneer at its office in Chicago. Equipment, furniture, and supplies such as stationery were furnished by Pioneer at its expense (Tenney dep. at 56, 59, 70 and 83). Mitchell solicited customers to trade in commodities on the telephone (all but one phone line furnished by Pioneer) and by direct mail to potential or former customers of Pioneer.

Mitchell was paid on a commission basis. Pioneer unilaterally set the rate (55–60%) at which Mitchell would be paid, based upon the volume of sales he generated (Tenney dep. at 42). From a gross commissions amount, Pioneer deducted any advancements it paid to Mitchell and certain recurring expenses such as health insurance premiums for the group health plan which Pioneer made available. Mitchell was also charged for other business expenses: postage, photocopy charges and phone charges. Pioneer did not deduct any employment taxes from Mitchell's commission checks.

Mitchell set his own working hours and while working did not have an immediate supervisor "stand[ing] over [his] shoulder" (plaintiff's dep. at 52). However, Tenney testified about the period (April 1983-September 1983) when he took over supervision of the Chicago office due to problems with Melvin Brown, vice-president of Pioneer and the supposed supervisor of this office (Tenney dep. at 76). During this time, Mitchell called Tenney to report if he would be late, and Tenney threatened sanctions for tardiness, such as charging Mitchell 25% for every order Tenney had to write for Mitchell while covering Mitchell's phone line and accounts (Tenney dep. at 40–41). Tenney also testified that any market letters sent out by Mitchell on Pioneer's stationery had to be shown to him first (Tenney dep. at 66). Further, after Tenney began supervising the Chicago office "nothing went out of there without [Tenney] knowing about it" (Tenney dep. at 68). Tenney stated he had a right to see all the materials mailed by Pioneer's APs because an FCM may ultimately be liable for acts of an AP (Tenney dep. at 27, 33–34 and 97).

On December 8, 1983, Mitchell received a letter from Pioneer's attorney notifying him that Pioneer's Chicago office was closed and that Mitchell's employment was terminated. Mitchell contends that his termination was racially motivated, a violation of Title VII.

## DISCUSSION

### 1. Who May Be a Title VII Plaintiff?

Defendants have focused their attention on the common law distinction between "employees" and "independent contractors." They urge that the record clearly shows that Mitchell was an independent contractor, and maintain that the independent contractors are not protected by Title VII. Mitchell contends that the specific label given an individual by an employer is not dispositive of his status. He argues that given the degree of control defendants exercised over him, he was an employee. Alternatively, he contends that even if he was not an employee in the traditional sense, nevertheless he still may bring this action under Title VII. Title VII was intended to protect any individual against the specific acts of which Mitchell complains, not only traditional common law employees but also others aggrieved by discrimination affecting employment opportunities.

Some courts, in attempting to determine whether an individual may sue under Title VII, have used as a framework of analysis the so-called "economic realities test" formulated by the District of Columbia Circuit in *Spirides v. Reinhardt*, 613 F.2d 826 (D.C.Cir.1979). That test is essentially an application of the common law rules for distinguishing between a "servant" and an "independent contractor" to the Title VII context. *Spirides* held that Title VII did not protect an independent contractor from discrimination in employment. 613 F.2d at 829. The Seventh Circuit mentioned, and appeared to endorse, the *Spirides* approach in *Unger v. Consolidated Foods Corp.*, 657 F.2d 909, 915 n. 8 (7th Cir.1981), *vacated on other grounds*, 456 U.S. 1002, 102 S.Ct. 2288, 73 L.Ed.2d 1297 (1982), *on remand*, 693 F.2d 703 (7th Cir.), *cert. denied*, 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1982), and referred to "economic realities" again in *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177, 1178 n. 2 (7th Cir.1984).

Nevertheless, in this circuit the common law distinction between servants and independent contractors does not control the question of who may bring a Title VII

action. *Unger* actually held that some persons ostensibly classified as independent contractors were employees for purposes of employment discrimination. A sales representative with a six-state territory, whose contract called her an independent contractor and who was paid entirely by commission, came within the class of persons Title VII was intended to protect and therefore was a proper plaintiff under the statute. 657 F.2d at 912, 916 n. 8. *Dowd* dealt with the question of who is a proper Title VII defendant, *i.e.*, who is an "employer" under 42 U.S.C. § 2000e(b), and did not cite *Spirides*. More recently, in *Doe v. St. Joseph's Hospital of Fort Wayne*, 788 F.2d 411 (7th Cir.1986), the court expressly held that a plaintiff who admitted that she was not an employee of the defendant was not barred from bringing a Title VII action.

In *Doe*, a physician sought to sue a hospital which had denied her staff privileges under Title VII. She did not dispute that she was not an employee of the hospital under the test which separates employees from independent contractors. Instead, she argued that denial of hospital staff privileges on the basis of sex was a practice Congress intended to prohibit when it enacted Title VII. Such conduct by the hospital interfered with the physician's employment opportunities, namely her ability to be employed by patients who needed the care and facilities which that hospital provided. The court agreed, holding that analysis should focus on whether the defendant had the power to affect the plaintiff's access to employment opportunities in a discriminatory manner, not whether the plaintiff was technically the defendant's employee. 788 F.2d at 422–423.

Defendants here are not entitled to judgment as a matter of law under either the "economic realities test" of *Spirides* nor the "affecting employment opportunities" analysis of *Doe*. The amount of control defendants exercised over Mitchell is disputed. Defendants have not demonstrated that a trier of fact could not find sufficient control to characterize Mitchell as an employee of Pioneer. Alternatively, if we approach the facts from the perspective outlined in *Doe*, assuming that Mitchell's customers employed him rather than Pioneer, there is no question that Pioneer had the power to affect Mitchell's ability to attract customers, and so his employment opportunities. Either way, his termination, if it was discriminatory, was the kind of discriminatory conduct Congress intended to protect him from by passing Title VII.

## 2. Was Mitchell an Employee?

■ The "economic realities test" calls for application of general principles of the law of agency to undisputed or established facts. *Spirides*, 613 F.2d at 831 (citation omitted). All circumstances surrounding the work relationship must be considered, no one factor being determinative. *Id.* Ultimately, the most important factor is the extent of control which an employer may exercise over a worker's performance of the job. *Id.*[1] *See also* Restatement (Second) of Agency §§ 2; 220(2)(a) (1958). "Where an employer has the right to control and direct the work of an individual not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Spirides*, 613 F.2d at 831–832.

---

1. Additional matters of fact that an administrative agency or reviewing court may consider include, among others: (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, *i.e.*, by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties. *Spirides*, 613 F.2d at 832.

Defendants argue that summary judgment is appropriate because there is no genuine issue of material fact regarding the employment relationship between the parties. Tenney stated in his deposition that he considered Mitchell an independent contractor. In fact, he was advised by legal counsel not to treat APs like Mitchell as employees in the traditional sense (Tenney dep. at 17). Further, Tenney points to the fact that Mitchell worked independently and without supervisory control. Defendants also point to the method of compensating Mitchell to support their conclusion that Mitchell is clearly an independent contractor.

The lengthy depositions taken in this case show that APs, defined at 17 C.F.R. § 1.3(aa), work like most salespersons. Their ability to cultivate customers and interest them in commodities trading is largely a product of their personal style and expertise developed after working in the commodities business. The federal regulatory scheme which governs the activities of APs and FCMs imposes a considerable amount of mutual dependence. APs cannot make trades for customers without an affiliation with an FCM. 7 U.S.C. § 6h; 17 C.F.R. § 3.12(a). APs may work only with one FCM at a time. 17 C.F.R. § 3.12(f)(1). Any accounts and customers APs obtain are customers of the FCM, not of the AP. *See* 7 U.S.C. § 6d. Any market information APs provide to their customers is transmitted under the FCM's name. 17 C.F.R. § 1.40. Confirmation statements for each customer's trading activity must be maintained by the FCM's, not the AP's. 7 U.S.C. § 6g; 17 C.F.R. § 1.33(a). The FCMs are ultimately liable for much of the work done by the APs while in their employ. *See Evanston Bank v. ContiCommodity Services, Inc.*, 623 F.Supp. 1014, 1022–23 (N.D.Ill.1985); *Commodities Futures Trading Commission v. Commodities Fluctuations Systems, Inc.*, 583 F.Supp. 1382 (S.D.N.Y.1984). In short, APs work for an FCM and are the essence of its business. Through APs the FCMs contact and serve their customers.

Pioneer labeled Mitchell an independent contractor and preferred to consider him as such. But labels given an individual are not dispositive of the individual's employment status. They are only one factor in the analysis. *Miller v. Advanced Studies, Inc.*, 635 F.Supp. 1196, 1200 (N.D.Ill.1986). Looking at the control factor, as the *Spirides* court emphasized, Mitchell's performance of his job more closely resembles the work of an employee. Pioneer and Tenney may not have exerted control or some type of supervision over Mitchell on a daily basis. However, according to the deposition testimony Tenney believed he had the right to, and in fact did, exercise control over Mitchell on a number of occasions. Mitchell's status resembles that of the saleswoman in *Unger* in several respects, including economic and managerial control and payment of some business expenses, and that court found her to be an employee for purposes of bringing a Title VII action. 657 F.2d at 916 n. 8. Defendants have not established beyond dispute that Mitchell was not an employee of Pioneer.

### 3. Was Mitchell Within the Class of Persons Title VII Protects?

█ More importantly, employee status is not necessarily the primary focus of, nor a threshold requirement to maintaining, a Title VII action. While an individual's status with an employer is not unimportant, the focus must be on whether the defendant can subject him to the type of acts Title VII was intended to prohibit. The purpose of Title VII is to eliminate hiring, firing and other practices relating to employment opportunities which are discriminatorily motivated. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). The language of Title VII is broad:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of em-

ployment because of such individual's race. . . .

42 U.S.C. § 2000e–2(a)(1).

There are no indications that "any individual" should be read to mean only an employee of an employer, as those terms are used in the law of agency. *Doe,* 788 F.2d at 422. Title VII should be construed "liberally so as to further the goals and purposes of eliminating discrimination in employment." *Unger,* 657 F.2d at 915 n. 8. Moreover, the language of Title VII indicates that Congress intended to prohibit employers, labor organizations and employment agencies from exerting any power they may have to foreclose, on discriminatory grounds, any individual's access to employment opportunities which would otherwise be available. *See Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1341 (D.C.Cir.1973).

Defendants rely on the language in 42 U.S.C. § 2000e(f) for their conclusion that Mitchell must be an employee to maintain a Title VII action. However, this section does not provide any definition for "employee" other than to state that "[an] employee [is] an individual employed by an employer." 42 U.S.C. § 2000e(f).[2] Moreover, in the provisions which define the private right of action at stake here, the statute does not speak of "employee," but rather uses the phrases "any individual" and "person aggrieved." § 2000e–2(a); § 2000e–5(e), (f)(1), and (f)(3). In *Doe,* the Seventh Circuit noted that the "common law independent contractor/employee test," which is at the heart of the defendants' argument, "is often not applied to antidiscrimination legislation because 'it is considered inconsistent with the remedial purpose behind such legislation.' " 788 F.2d at 425 n. 28, *quoting Mares v. Marsh,* 777 F.2d 1066, 1067 n. 1 (5th Cir.1985). The court in *Doe* emphasized giving a plaintiff the opportunity to show that Title VII

was intended to protect persons from the acts of discrimination by an employer or discriminatory interference with employment opportunities which he or she suffered. 788 F.2d at 426.

The Seventh Circuit in *Doe* held that it would be contrary to the legislative intent behind Title VII to summarily conclude that certain individuals not meeting a technical definition of "employee" from common law agency are foreclosed from seeking relief for alleged acts of discrimination in employment. 788 F.2d at 424. In *Armbruster v. Quinn,* 711 F.2d 1332 (6th Cir. 1983), the Sixth Circuit Court of Appeals formulated a variation on the economic realities test which focuses on

> the economic realities underlying the relationship between the individual and the principal in an effort to determine whether that individual is likely to be susceptible to the discriminatory practices which . . . [Title VII] was designed to eliminate.

711 F.2d at 1340. The court's reasoning in *Doe* tracks the *Armbruster* court's emphasis on a plaintiff's exposure to harm in his compensation, or in the terms, conditions or privileges of his employment, from an employer's discriminatory practices. 788 F.2d at 425. The employer need not have been the plaintiff's employer in terms of agency law, as long as it is an "employer" within the definition of the statute, and its acts had a discriminatory effect on the plaintiff's employment. *Cf.* 42 U.S.C. § 2000e– 2(a)(1).

In *Doe* the physician admitted that her patients, not the hospital, employed her. She nevertheless contended that Title VII protected her against a hospital's denial of staff privileges on the basis of her sex, since such a denial restricted the opportunities she would otherwise have for patients to employ her. The Seventh Circuit held that she stated a claim, despite the hospital's protests that she could still function

---

**2.** While the term "employer" is defined in Title VII, 42 U.S.C. § 2000e(b), that statute sheds no light on the issue here. An employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees during a specified period." The Seventh Circuit

has already indicated that the definition of "employee" for purposes of determining the number of "employees" a business has does not necessarily control the question of who is eligible to sue under Title VII. *See Dowd,* 736 F.2d at 1178 n. 2.

quite adequately as a physician without those privileges. The hospital pointed out that nothing prevents a physician from having privileges at more than one hospital at a time, so that she presumably retained her other privileges elsewhere, plus the ability to treat patients in her office. The court found that loss of one set of staff privileges was enough to significantly affect her employment opportunities. 788 F.2d at 423–424; *see also Pao v. Holy Redeemer Hospital,* 547 F.Supp. 484 (E.D. Pa.1982).

■ Pioneer's power to cut off Mitchell's chances at customers was far greater than the power the hospital had over the physician in *Doe.* An AP in commodities, unlike a physician, cannot have "privileges" at more than one FCM at a time. 17 C.F.R. § 3.12(f)(1). Neither can he carry out his profession, making trades for customers, at an office of his own. To trade for others, he must have an affiliation with an FCM. 17 C.F.R. § 3.12(a). If the plaintiff in *Doe* had a claim under Title VII, then so does Mitchell.

We do not, of course, presume that defendants in fact closed their Chicago office in order to discriminate against Mitchell. Defendants chose to rest their motion on the ground that even if Mitchell's termination was discriminatory, he is not a proper Title VII plaintiff. But defendants have not eliminated all dispute about facts which could make Mitchell their employee. And if he was not, then his customers employed him, in which case defendants had the power to significantly restrict Mitchell's employment opportunities by foreclosing his access to customers. If defendants discharged him on account of his race, Title VII protects him against such a discharge. Therefore, defendant's summary judgment motion is denied, as well as defendants' motion to dismiss plaintiff's pendent state law claims.

### CONCLUSION

Defendants' motions are denied.