Usha **VAKHARIA**, M.D., Plaintiff,

v.

**SWEDISH COVENANT HOSPITAL,** Nancy Loeber, M.D., Demetrius Trakas, M.D., Loren Dardi, M.D., Johanna Chookaszian, M.D., Marshall Salkin, M.D., Walten Baba, M.D., James McCormick, M.D., Alvin Somberg, M.D., Paul Larson, M.D., Roberto Espinosa, M.D., Edward Paulissian, M.D., S. Yelda, M.D., M. Barry Kirschenbaum, M.D., and G. Christopoulos, M.D., Defendants.

No. 90 C 6548.

United States District Court, N.D. Illinois, E.D.

May 22, 1991.

MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiff Dr. Usha Vakharia ("Vakharia"), a 45–year old woman born in Bombay, India, and a physician specializing in anesthesiology, claims that her privileges as a member of the medical staff of Swedish Covenant Hospital ("the Hospital") were restricted and ultimately terminated on discriminatory grounds. In a four-count complaint filed against the Hospital, Dr. Nancy Loeber ("Loeber"), who was the chairman of the Hospital's Department of Anesthesiology during the relevant period, and the fourteen members, all physicians, of the Hospital's Medical Staff Executive Committee ("individual defendants"), Vakharia charges that, beginning in 1987, she was assigned fewer and less desirable cases, was classified as a "junior member" of the anesthesiologist department with concomitant restrictions on her practice, was rejected from positions for which she had applied and was qualified, and was summarily—and ultimately permanently—suspended from the medical staff at the Hospital. These discriminatory actions, Vakharia alleges, were taken because of her color, race, national origin, age, and sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (1988), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (1988), section 1981 of the 1866 Civil Rights Act ("section 1981"), 42 U.S.C. § 1981 (1988), and her contract with the Hospital as reflected in the Medical Staff Bylaws.

Now before this court are two motions to dismiss, one filed by the Hospital and Loeber and the second by the individual defendants. Vakharia's federal claims, the Hospital and Loeber argue, are not viable because Vakharia has alleged no facts that would establish an employment relationship, which is necessary for Title VII, and because she is complaining only of post-contract-formation conduct, which is not actionable under section 1981. The individual defendants, who are implicated only in count IV's breach of contract claim, assert that they were not responsible for Vakharia's termination, do not have the authority to grant the relief sought and therefore are not appropriate parties to this lawsuit. We consider these arguments in turn.

DISCUSSION

A. *Title VII: Employment Relationship*

■ Under Title VII, it is unlawful for an employer

to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2(a)(1). The discrimination targeted by Title VII "relates to the field of employment," 1 A. Larson & L. Larson, *Employment Discrimination* § 5.21, at 2–9 (1991); *Graves v. Women's Professional Rodeo Ass'n,* 708 F.Supp. 233, 235 (W.D.Ark.1989), *aff'd,* 907 F.2d 71 (8th Cir.1990), and therefore courts have consistently held that "Title VII contemplates some employment relationship." *Broussard v. L.H. Bossier, Inc.,* 789 F.2d 1158, 1159 (5th Cir.1986); *Mitchell v. Frank R. Howard Memorial Hospital,* 853 F.2d 762, 766 (9th Cir.1988) (*"Frank R. Howard"*), *cert. denied,* 489 U.S. 1013, 109 S.Ct. 1123, 103 L.Ed.2d 186 (1989); *Diggs v. Harris Hospital–Methodist, Inc.,* 847 F.2d 270, 272 (5th Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988); *Gomez v. Alexian Bros. Hospital of San Jose,* 698 F.2d 1019, 1021 (9th Cir.1983); *Lutcher v. Musicians Union Local 47,* 633 F.2d 880, 883 (9th Cir.1980). This relationship, however, need not link together the plaintiff and the defendant; claims that a defendant interfered with the plaintiff's employment opportunities with third parties have been allowed where the defendant controls the access to these opportunities. *See Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338 (D.C.Cir.1973); *Doe on behalf of Doe v. St. Joseph's Hospital,* 788 F.2d 411, 422–23 (7th Cir.1986); *Zaklama v. Mt. Sinai Medical Center,* 842 F.2d 291, 294 (11th Cir.1988); *Puntolillo v. New*

*Hampshire Racing Comm'n*, 375 F.Supp. 1089 (D.N.H.1974).[1]

In *Sibley*, the seminal case in this area, the plaintiff, a male private duty nurse, complained that on two occasions the defendant-hospital, after communicating to a registry of nurses the need for a private nurse on behalf of a female patient, prevented him from reporting to the requesting patient because of his sex. Finding it quite clear that the plaintiff and defendant "did not contemplate any immediate or future relationship of direct employment in the sense of the usual indicia of such employment," 488 F.2d at 1342, the *Sibley* court observed that the manifest congressional objective of Title VII was " 'to achieve *equality of employment opportunities,*' " *id.* at 1340–41 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1969)) (emphasis in *Sibley* ), and Congress therefore intended to prohibit any employer with control over access to the job market from foreclosing, for invidious reasons, those opportunities to individuals. A contrary interpretation would make little sense:

> To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

*Sibley*, 488 F.2d at 1341. Reasoning additionally that a broader construction is consistent with Title VII's prohibition of discrimination *against any individual* rather than against those individuals who stand in direct employment relationships with an employer, the *Sibley* court concluded that the plaintiff could succeed on a Title VII claim against the hospital, which controlled plaintiff's access to patients for employment purposes, if he could establish that the hospital blocked access to female patients because he was male. *Id.* at 1342.

It is not entirely clear what "employment relationship" formed the basis of the Title VII claim sustained in *Sibley*. One possible interpretation is that the court found an indirect employment relationship between the plaintiff and defendant in light of the hospital's control over access to the patients. Alternatively, the requisite employment relationship may be represented by the nurse-patient association. There is some indication in *Sibley* itself, as well as in several of its progeny, that the former interpretation is proper. In reaching its conclusion, the *Sibley* court repeatedly stressed that Title VII did not require—and the plaintiff in that case could not assert—a *direct* employment relationship between the litigating parties; the negative implication is that the relationship between the *Sibley* parties was *indirect* and that such an relationship could give rise to a cognizable Title VII claim. The court, moreover, observed that the patients were responsible for compensating private nurses and could accept or reject their services but did not refer to these patients as the nurses' "employers" or the relationship between patient and nurse as an "employment relationship." *See also Gomez*, 698 F.2d at 1021 (recognizing that there must be an employment relationship to trigger Title VII liability but that " 'the connection with employment need not necessarily be direct' " (quoting *Lutcher*, 633 F.2d at 883)). In *Shrock v. Altru Nurses Registry*, 810 F.2d 658, 660 (7th Cir.1987), moreover, the Seventh Circuit emphasized the importance of an indirect relationship between the plaintiff and defendant in the *Sibley* line of cases, suggesting that in the absence of such a relationship, a claim of

---

**1.** In *Shrock v. Altru Nurses Registry*, 810 F.2d 658 (7th Cir.1987), the defendant was found to fall outside the purview of Title VII, but the Seventh Circuit cast some doubt on the proposition that a defendant could be liable under Title VII for interference with a plaintiff's employment opportunities with third parties, observing that it "need not decide when, *if ever*, an employer covered by [Title VII] can be held liable for conduct toward someone who is not its employee." 810 F.2d at 660 (emphasis added). Because the *Shrock* court left the question open, we are bound by the *Doe* decision, which clearly understands Title VII to comprehend that sort of claim.

interference with employment opportunities may not be actionable under Title VII. And one of the several formulae for determining whether a plaintiff is a protected individual under Title VII tests whether the defendant can subject the plaintiff "to the discriminatory practices which the act was designed to eliminate." *Armbruster v. Quinn,* 711 F.2d 1332, 1340 (6th Cir.1983); *cf. Mallare v. St. Luke's Hospital,* 699 F.Supp. 1127, 1130 (E.D.Pa.1988) (hospital may enjoy an employment relationship with a physician where the physician "depends on access to a hospital for his patients and is unlikely to attract many patients without such access").

More persuasive, however, is the interpretation that finds the employment relationship in the link between the plaintiff and the third party. Although the *Sibley* court does not refer to the patients as "employers," it does speak of the private nurses' relations with patients in terms of "employment." *See* 488 F.2d at 1342 (observing that the hospital controlled plaintiff's "access to the patient for the purposes of the initiation of such employment"). Courts that have recognized the category of claims that *Sibley* brought within the scope of Title VII, moreover, understand these claims as alleging interference with plaintiff's "employment opportunities." *See, e.g., Pardazi v. Cullman Medical Center,* 838 F.2d 1155, 1156 (11th Cir.1988). The Seventh Circuit in *Doe,* without recognizing the possibility of a competing construction, appears to have interpreted the *Sibley* approach as requiring that the plaintiff have some sort of employment relationship with the third party. *See* 788 F.2d at 424. Other courts that have, guided by *Sibley,* considered interference with employment opportunities with third parties as possible Title VII violations have similarly proceeded to analyze whether the relationship between the plaintiff and the third party can be considered one of employment. *See Frank R. Howard,* 853 F.2d at 767 (no facts alleged supporting a finding that a physician's relationship with his patients is an employment relationship); *Lutcher,* 633 F.2d at 884 (summary judgment granted to defendant where "at

most the [defendant] interfered with an independent contractor," as opposed to an employment, relationship with a third party); *Graves,* 708 F.Supp. at 238 (interference with the ability to compete in a rodeo for prize money does not amount to interference with an employment relationship); *Nanavati v. Burdette Tomlin Memorial Hospital,* 42 Fair Empl.Prac.Cas. (BNA) 197, 200, 1986 WL 15318 (D.N.J.1986); *Beverley v. Douglas,* 591 F.Supp. 1321, 1328 (S.D.N.Y.1984); *cf. Mitchell v. Tenney,* 650 F.Supp. 703, 709 (N.D.Ill.1986) ("*Tenney*") (assuming that if the plaintiff was not an employee of the defendant, "then his customers employed him"); 1 A. Larson & L. Larson, *supra* p. 3, § 5.21, at 2–8 (asserting that in *Sibley,* the private nurse "[c]learly … stood in an employment-type relationship with the patient"). More explicitly, the court in *Diggs,* 847 F.2d at 273, spelled out such a requirement: "Even if we were to hold that [Title VII covers interference] with a [plaintiff's] relationship with a third party—a question we do not reach [—] that relationship would have to be an employment relationship under the economic realities/common law contract control test." *See also Smith v. Dutra Trucking Co.,* 410 F.Supp. 513, 518 & n. 11 (N.D.Cal.1976), *aff'd,* 580 F.2d 1054 (9th Cir.1978), *cert. denied,* 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 43 (1979).

■ Even those cases that appear to focus on the indirect relationship between the plaintiff and the defendant do not rule out the need for an employment relationship between the plaintiff and a third party in interference cases. The *Gomez* court, after observing that the connection with employment need not be direct, recognized that Title VII also encompassed claims of interference with " 'an individual's employment opportunities with *another employer,*' " 698 F.2d at 1021 (quoting *Lutcher,* 633 F.2d at 883 n. 3) (emphasis added), and noted that the defendant in that case did not dispute that the plaintiff was an "employee" of the third party. And although the *Shrock* court seems to suggest that a defendant will not be liable under Title VII unless he shares at least an indirect em-

ployment relationship with the plaintiff, that decision appears to take a fairly restrictive approach to Title VII liability for interference with employment opportunities; it is unlikely that the court intended to *relax* the employment relationship requirement by allowing an indirect nexus between the litigating parties to supplant the need for an employment relationship between the plaintiff and the third party.

We find there to be little question, then, that at least in this circuit, *Sibley* liability (for interference with employment opportunities with third parties) requires an employment relationship between the plaintiff and the third party. Whether the plaintiff must demonstrate additionally that he and the defendant were connected by an indirect relationship we need not determine, for the nexus between Vakharia, an anesthesiologist with medical staff privileges at the Hospital, is certainly as close as the link between the doctor and hospital in *Doe*, which the *Shrock* court recognized as an "indirect employer-employee relationship." *Shrock*, 810 F.2d at 660.

Vakharia asserts two possible employment relationships in support of her Title VII claim: one with the Hospital and the second with her patients and prospective patients. To determine the viability of each of these assertions, we must first establish the proper standard to apply. Three tests have been developed to distinguish employment relationships from nonactionable business affiliations: the economic realities test exemplified by *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983), the common law "right to control" test, *see Smith*, 410 F.Supp. at 516, and the hybrid economic realities-common law control test championed by *Spirides v. Reinhardt*, 613 F.2d 826 (D.C.Cir.1979).[2] Although it is clear that the strict common law test, the most restrictive of the three, is not favored in this circuit, there is some confusion as to whether the hybrid test or the economic realities test is the proper Seventh Circuit standard.

■ The hybrid economic realities-common law control test analyzes "the 'economic realities' of the work relationship" in accordance with "general principles of agency law," with special emphasis on "the extent of the employer's right to control the 'means and manner' of the worker's performance." *Spirides*, 613 F.2d at 831 (footnotes omitted). The term "economic realities" refers to the "degree of economic dependence of the worker on the putative employer." 1 A. Larson & L. Larson, *supra* p. 3, § 5.22, at 2–13. Eleven factors in addition to the employer's right to control are to be considered, with no factor determinative:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.*, by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

613 F.2d at 832; *see also Diggs*, 847 F.2d at 272–73; *Beverley*, 591 F.Supp. at 1326. The pure economic realties test is a more expansive standard, *see Diggs*, 847 F.2d at 272 n. 1, rejecting the neat dichotomy be-

---

**2.** In *Mitchell v. Tenney,* this court identified two tests for determining whether an employment relationship was present: the *Spirides* hybrid test for plaintiff-defendant relationships and the *Doe* "interference with employment opportunities" analysis for plaintiff-third party relationships. *See* 650 F.Supp. at 706. The *Doe* test, however, is not a separate test at all: it requires a further inquiry to determine whether the opportunities interfered with rise to the level of employment relationships. Moreover, as discussed in detail *infra,* we believe that the *Armbruster* economic realities test is the appropriate standard in this circuit.

tween employees and independent contractors that informs other tests and eliminating from the inquiry the common-law agency component. *See Armbruster*, 711 F.2d at 1341. Instead, this approach instruct courts to examine "the economic realities underlying the relationship between the individual and the so-called principal in an effort to determine whether that individual is likely to be susceptible to the discriminatory practices which the act was designed to eliminate." *Id.* at 1340.

Surveying three Seventh Circuit opinions, Judge Aspen in *Miller v. Advanced Studies, Inc.*, 635 F.Supp. 1196, 1199–1200 (N.D.Ill.1986), concluded that this circuit "appears to have joined the *Armbruster* camp." Arthur Larson and Lex Larson, in their treatise on employment discrimination, disagree. *See* 1 A. Larson & L. Larson, *supra* p. 3, § 5.22, at 2–17 to 2–18. In *Unger v. Consolidated Foods Corp.*, 657 F.2d 909, 915 n. 8 (7th Cir.1981), *vacated on other grounds*, 456 U.S. 1002, 102 S.Ct. 2288, 73 L.Ed.2d 1297 (1982), the Seventh Circuit apparently embraced, albeit in a footnote, the hybrid economic realities-common law control test of *Spirides* to determine whether the plaintiff was an employee or an independent contractor. Several years later, in *E.E.O.C. v. Dowd & Dowd. Ltd.*, 736 F.2d 1177, 1178 (7th Cir.1984), the court seemingly reversed directions, citing *Armbruster* and holding that the employment relationship issue must be assessed "with strong consideration of the economic realities of the employment relationship." Although *Dowd & Dowd*, after laying out its understanding of the economic realities test, cites *Unger* favorably, it appears clear both from *Dowd & Dowd* itself and from *Doe*, in which the court cites *Dowd & Dowd* as espousing the economic realities—rather than the hybrid—test, that *Dowd & Dowd* did in fact adopt the *Armbruster* approach. And *Dowd & Dowd*, as the later authority, must control.[3]

■ An examination of the rationales behind each of the standards, moreover, persuades us that reliance on the *Armbruster* test is appropriate in this circuit. In *Spirides*, the D.C. Circuit addressed the employment relationship issue in a slightly different context; the plaintiff in that case was a federal employee, who fell within the prescripts of Title VII by virtue of a 1972 amendment. In contrast to the language of the original statute, which refers to "any individual" or "person aggrieved" rather than "employee," *see* 42 U.S.C. § 2000e–2(a)(1), the 1972 amendment encompasses "actions affecting *employees or applicants for employment*" with the federal government. 42 U.S.C. § 2000e–16(a) (emphasis added). Recognizing the clear congressional intent that coverage be limited to federal *employees*, the *Spirides* court held that

> the 1972 amendments to Title VII cover only those individuals in a direct employment relationship with a government employer. Individuals who are independent contractors or those not directly employed by such an employer are unprotected. Status as an employee is therefore of crucial significance for those seeking to redress alleged discriminatory actions in federal employment.

613 F.2d at 829–30 (footnotes omitted). The *Spirides* test, then, was tailored to distinguish between independent contractors and employees for the purpose of the 1972 amendment. That Title VII coverage in the non-federal employment context is not limited to "employees" is firmly established in this circuit. *See Doe*, 788 F.2d at 422 (invoking *Sibley*, 488 F.2d at 1341); *Ellerby v. Illinois, Fifteenth Judicial Circuit Court*, 46 Fair Empl.Prac.Cas. (BNA) 524, 525 (N.D.Ill.1988). Moreover, recent cases have cast doubt upon the propriety of the bright line between employees and in-

---

**3.** Arthur Larson and Lex Larson suggest that, despite the later *Dowd & Dowd* opinion, *Unger* remains good precedent because it alone expressly addresses the employer-independent contractor issue. 1 A. Larson & L. Larson, *supra* p. 3, § 5.22, at 2–17 to 2–18. But the dispute in *Dowd & Dowd*—whether shareholders in a professional corporation engaged in the practice of law share an employment relationship with the corporation—is functionally equivalent to the employee-independent contractor issue, and we do not find persuasive Larson & Larson's distinction.

dependent contractors that the *Spirides* court was compelled to draw in light of the peculiarities of the 1972 Amendment. *See Tenney,* 650 F.Supp. at 705–706; *Graves,* 708 F.Supp. at 235 ("once an employer is covered by the act, Title VII protection extends to any aggrieved individual without regard to the existence of a traditional employment relationship."). In deciding whether an employment relationship is present in this case, then, we will follow the economic realities approach of *Armbruster.*

Identifying the proper standard to apply is only half the battle: actually applying it presents altogether new problems. Determining whether the plaintiff is engaged in an employment relationship is a fact-intensive inquiry that requires a "careful analysis of the myriad facts surrounding the employment relationship in question." *Miller,* 635 F.Supp. at 1200; *see also Frank R. Howard,* 853 F.2d at 766; *Mallare,* 699 F.Supp. at 1129. Such an issue is properly decided at the motion-to-dismiss stage only if "the complaint happens to allege facts which clearly preclude the possibility that the plaintiff is" involved in an employment relationship. *Miller,* 635 F.Supp. at 1200.[4] In *Frank R. Howard,* the only case to discuss the employment relationship issue as it relates to the doctor-hospital relationship in the context of a motion to dismiss, the court held that the pleadings were not insufficient on their face to sustain a Title VII claim. 853 F.2d at 766–67. Although the court applied a version of the hybrid test, the court's holding in that case depended in part on an analysis of the economic realities of the relationship; to the extent additional factors were considered, those factors, drawing on common law agency principles, would serve only to make the test *more* difficult for the plaintiff.

■ All of the cases cited by the hospital in favor of dismissal treat the employment relationship issue in the context of a summary judgment or directed verdict motion or judgment after a bench trial. *See Diggs,* 847 F.2d 270; *Pardazi,* 838 F.2d 1155; *Beverley,* 591 F.Supp. 1321; *Amro v. St. Luke's Hospital,* 39 Empl.Prac.Dec. (CCH) ¶ 36,079 at 42,105, 1986 WL 766 (E.D.Pa.1986); *see also Nanavati,* 42 Fair. Empl.Prac.Cas. 197. The physicians' practices in those cases, moreover, were marked by a much stronger sense of independence and self-determination than Vakharia's practice seems to be. Because of her specialty (anesthesiology), Vakharia did not have an outside practice or outside patients whom she would admit to the Hospital as she deemed necessary; rather, she obtained patients through assignment by the Hospital and referral by staff surgeons at the Hospital who requested her services. The Hospital, Vakharia alleges, was able to cut back on her workload by assigning her fewer cases and designating her as a "junior" anesthesiologist, which disqualified her from using nurse anesthetists to assist in procedures. This reduction forced her to cut her insurance to part-time and limit the number of days each week that she worked at the Hospital. *Cf. Diggs,* 847 F.2d at 273 (plaintiff was under no duty to admit any of her patients to defendant-hospital); *Beverley,* 591 F.Supp. at 1327 (physicians with voluntary privileges have practices outside the Hospital and are self-employed or are professional corporations). In these circumstances, the allegations of the complaint clearly do not preclude the possibility that Vakharia and the Hospital shared an employment relationship.

Alternatively, we find that Vakharia has adequately alleged the existence of an employment relationship between herself and her patients or prospective patients. In *Doe,* presented with a fact pattern quite similar to the instant case, the Seventh Circuit considered whether to extend the *Sibley* analysis from the private nurse-pa-

---

**4.** Although the hybrid economic realities-common law control test takes a more restrictive view of employment relationships, it also involves more factors, and it may be even more inappropriate to decide the employment relationship issue on a motion to dismiss under that approach. *Cf. Amro v. St. Luke's Hospital,* 39 Empl.Prac.Dec. (CCH) ¶ 36,079 at 42,105 (E.D. Pa.1986) ("The balancing of the different factors [under the hybrid test] is not as simple as it would seem.").

tient context to the physician-patient context. Recognizing that "it may be difficult to distinguish the employment relationship[s]" between these two sets, the court concluded that it was "far from certain that the doctor-patient relationship would not be protected under a *Sibley* analysis. There is substantial uncertainty about the type of employment relationship that is protected by such an analysis. Because of this uncertainty, it is premature to dismiss plaintiff's Title VII claim at the pleading stage." 788 F.2d at 425. The court cited, in support of this conclusion, *Pao v. Holy Redeemer Hospital*, 547 F.Supp. 484 (E.D. Pa.1982), which denied a motion to dismiss the plaintiff-physician's Title VII claim, holding that the defendant in that case "had the same capacity as the defendant in *Sibley* to control the plaintiff's access to those prospective patients *who are his ultimate employers." Pao*, 547 F.Supp. at 494 (emphasis added). Since the *Doe* decision, the Ninth Circuit in *Frank R. Howard*, on motion to dismiss, held that the traditional patient-doctor relationship does not, as a general matter, rise to the level of employment, and because the plaintiff there failed to allege that his relationship with his patients was atypical, a Title VII claim could not be sustained. 853 F.2d at 767. *Frank R. Howard* clearly takes a view of the doctor-patient issue contrary to *Pao*, and it offers little by way of explanation or analysis. Moreover, it completely ignores the *Sibley* decision, on which the *Doe* court strongly relied and which would have to be persuasively distinguished for the Seventh Circuit to alter the course it took in *Doe*. Bound by *Doe*, and finding *Frank R. Howard* unconvincing, we conclude that Vakharia's allegations of an employment relationship with her patients are also sufficient to survive this motion to dismiss.

## B. *Section 1981 Claim*

While Title VII targets all discrimination relating to the field of employment, section 1981 protection extends only to the making and enforcing of public and private contracts:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. *See Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (section 1981 applies to private contracts). Two years ago in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court circumscribed the scope of claims cognizable under section 1981, excluding from coverage "conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." 491 U.S. at 177, 109 S.Ct. at 2373. Although the Court did not reach the issue of discriminatory discharge in *Patterson*, the Seventh Circuit, along with the majority of jurisdictions, has unequivocally held such conduct nonactionable under section 1981. *See, e.g., McKnight v. General Motors Corp.*, 908 F.2d 104, 108–109 (7th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991). Drawing on *Patterson* and its progeny, the Hospital maintains that Vakharia is essentially complaining of discriminatory discharge and therefore her charges comprise only post-contract-formation conduct. Vakharia counters with two examples of alleged pre-contract discrimination: the Hospital's refusal to enter into a new contract with her for full staff privileges for 1990 after she had been discharged, and the interference with her ability to enter into new contracts with prospective patients.

### 1. Failure to Rehire

While Vakharia was affiliated with the Hospital, her staff privileges were subject to renewal on a yearly basis; Vakharia indicates in her complaint that "[e]ach year from 1974 through 1989, Swedish Covenant Hospital unconditionally renewed [her] hospital staff privileges" (Complaint ¶ 13). In

December 1989, subsequent to her suspension in July 1989 but before the suspension was affirmed by the Board of Directors, Vakharia applied for "renewal of her staff privileges for 1990," but the application was not considered by the Hospital (Complaint ¶ 37). It is this failure to renew that Vakharia challenges under section 1981.

In addition to refusing to recognize discriminatory discharge under section 1981, post-*Patterson* courts have been unwilling to allow plaintiffs to avoid the application of this doctrine through creative pleading. Thus courts have declined the invitation to view the employment-at-will relationship as a series of daily contracts and the termination of an at-will employee as discrimination at the formation of the new contract for the following day. *See McKnight,* 908 F.2d at 109; *Carter v. O'Hare Hotel Investors,* 736 F.Supp. 158, 159–160 (N.D.Ill. 1989). Extending that principle one step further, courts have similarly held nonactionable under section 1981 claims based on a refusal to renew the contract of a plaintiff employed by a series of year-to-year contracts. *See Chawla v. Klapper,* 743 F.Supp. 1284, 1290–91 (N.D.Ill.1990) (viewing as post-formation conduct the refusal to renew the appointment of an assistant professor of dentistry employed by a series of one year contracts where the renewal would not result in any change in responsibilities; at-will employee scenario found indistinguishable); *Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Educ.,* 926 F.2d 505, 509 (6th Cir. 1991); *but see Jones v. United States Postal Serv.,* No. 89–399–CMW, 1990 WL 5198 (D.Del. Jan. 26, 1990).

■ Although the court in *Chawla* emphasized the existing employment relationship between the plaintiff and the defendant in finding that the periodic renewal in that case did not rise to the level of contract formation, *see* 743 F.Supp. at 1291, courts have applied a similar theory to failure-to-rehire claims in cases where the employment relationship has been completely severed. The scenario is quite common: an employee is unconditionally discharged from his position and sometime thereafter seeks, unsuccessfully, reinstatement. To the extent the "new" position carries with it the same "rights, duties, and obligations established by the[ ] prior agreement" between the parties, these claims have been found nonactionable under section 1981 because they are "essentially ... based on the discrimination which allegedly occurred in the termination of the[ ] prior agreement." *Rick Nolan's Auto Body Shop, Inc. v. Allstate Insurance Co.,* 718 F.Supp. 721, 722 (N.D.Ill.1989); *see also Smith v. Continental Insurance Corp.,* 747 F.Supp. 275, 281–82 (D.N.J.1990) (refusal to rehire for identical position from which plaintiff was discharged fails to state a claim under section 1981); *Bailey v. Johnson,* No. 90 C 1795, 1990 WL 115561 (N.D.Ill. Aug. 9, 1990). But like promotion claims, which *Patterson* held to be cognizable when the "nature of the change in position [i]s such that" it offers "an opportunity for a new and distinct relation between the employee and the employer," 491 U.S. at 185, 109 S.Ct. at 2377, failure-to-rehire claims "involve a change in the employment relationship that may be described as formation-like in certain respects but, nonetheless, also present strong aspects of contractual continuity." *Jones v. ANR Freight System, Inc.,* No. 89 C 7105, 1990 WL 7178 (N.D.Ill. Jan. 17, 1990). In determining whether a discriminatory failure to rehire or reinstate falls within the purview of section 1981, then, courts are guided by *Patterson*'s "new and distinct relationship" standard. *See Carter,* 736 F.Supp. at 160; *Eklof v. Bramalea Ltd.,* 733 F.Supp. 935, 937 (E.D.Pa.1989). *But cf. Drake v. Jewel Cos., Inc.,* No. 87 C 8545, 1990 WL 119554 (N.D.Ill. Aug. 14, 1990) ("Jewel fired Drake, and the Court does not think Drake can avoid this fact by claiming he sought a new employment relationship").[5]

---

5. In *Von Zuckerstein v. Argonne National Laboratory,* 760 F.Supp. 1310 (N.D.Ill.1990), this court implied that the "new and distinct relationship" analysis is not necessary if the employment relationship was severed before reinstatement is sought. To the extent that passage is interpreted as recognizing a section 1981 claim whenever a plaintiff applies for a position after a permanent discharge, we no longer sanction that approach.

■ Vakharia maintains that the position she sought in December 1989 should be considered a new and distinct relationship because it "would have entitled her to broader privileges than she had under her old contract," under which she had been designated a "junior" staff member (Plaintiff's Response at 14). It is clear from the face of the complaint, however, that the position for which Vakharia applied at that time was identical to the position she had held since 1974 (*see* Complaint ¶¶ 13 ("[e]ach year from 1974 through 1989, Swedish Covenant Hospital *unconditionally* renewed Dr. Vakharia's hospital staff privileges"); 30 (on February 1, 1989, the Hospital informed Vakharia that the Board of Directors "had *unconditionally* renewed her full staff privileges for 1989"); 37 ("[i]n December 1989, Dr. Vakharia applied to the hospital for *renewal* of her staff privileges for 1990") (emphases added)). Vakharia's classification as "junior anesthesiologist" had no bearing on the official nature of her contractual relationship with the Hospital; indeed, after the classification system was imposed, Vakharia's staff privileges remained unconditional and unrestricted (Complaint ¶¶ 20, 27). That Vakharia may have been subject to special, ultra-contract conditions that she was hoping to eliminate in 1990 does not make the 1990 renewal "new and distinct" for section 1981 purposes; the staff privileges that she sought were literally identical to those that she previously had, and the "new" contract could no more ensure that she would be designated a "senior" anesthesiologist than the "old" contracts had. Vakharia herself recognizes in the complaint that her application for 1990 privileges was tantamount to a request for the renewal of the same privileges that she had previously enjoyed: "In December 1989, Dr. Vakharia applied to the Hospital for *renewal* of her staff privileges for 1990" (Complaint ¶ 37 (emphasis added)). There is no indication anywhere in the complaint that Vakharia's contract for 1990 would in any way diverge from her contract in years past, and therefore we must conclude as a matter of law that the 1990 contract did not offer an opportunity for a new and distinct relationship with the Hospital.

2. Contracts with Patients

The Hospital interfered with her ability to enter contractual relations with prospective patients, Vakharia asserts, both by restricting her access to patients and by ultimately suspending her privileges. Focusing on Vakharia's ongoing affiliation with the Hospital as a member of the medical staff, the Hospital contends that Vakharia is in essence challenging the Hospital's termination of her contractual relationship after that relationship had long been in existence; the impact on Vakharia's relations with patients, the Hospital continues, is "part and parcel of the termination of plaintiff's Hospital privileges," which included the privilege of servicing patients there (Defendants' Reply at 13).

■ In protecting the right to make contracts, section 1981 proscribes not only discrimination by the contracting party at the contract-formation stage but also discriminatory interference by a third party with the exercise of the right to make contracts. *See Kolb v. State of Ohio, Dep't of Mental Retardation and Developmental Disabilities*, 721 F.Supp. 885, 891–92 (N.D.Ohio 1989) (post-*Patterson*); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir.), *cert. denied*, 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975). Under this analysis, the relationship between the plaintiff and the third party-interferer is irrelevant; as long as the interference prevents or impedes the formation of a contract, it is covered by section 1981. The Hospital's alleged reduction in the quantity and quality of Vakharia's caseload beginning in 1987 (Complaint ¶ 18), classification of her as a "junior" anesthesiologist, which confined her to a limited number of relatively simple types of procedures (*id.* ¶¶ 20, 21), unofficial suspension of Vakharia in July 1988 (*id.* ¶ 26), removal of her from the "first call" schedule (*id.*), and limitation on the number of cases she could handle through its control over the scheduling of rooms within the department (*id.* ¶ 27) all seem to fall easily within the rubric of proscribed

conduct. Because Vakharia was, during her affiliation with the Hospital, able to obtain patients only through assignment by the Hospital and referral by staff surgeons (*id.* ¶ 45), and in light of Vakharia's allegation that "[s]he regularly entered into agreements to perform anesthesiology services with the individual patients assigned to her by the Hospital and referred to her by staff surgeons" (*id.*), we think Vakharia is entitled to proceed on a claim of interference with her ability to make contracts with prospective patients under section 1981. *See Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan,* 518 F.Supp. 993, 1008 (S.D.Tex.1981) (section 1981 claim permitted where plaintiffs complained of defendants' threats and intimidation, which interfered with their ability to make commercial arrangements with dock owners and thereby engage in the commercial fishing business).

## C. *Improper Joinder of Individual Defendants*

Vakharia brings Count IV, which contains allegations of breach of contract and violations of the Hospital's Medical Staff Bylaws, against the Hospital and the individual defendants—the fourteen doctors who make up the Hospital's Medical Executive Committee. These individual defendants in turn have submitted a motion to dismiss the complaint as it relates to them, asserting that the Medical Executive Committee was not responsible for the ultimate termination of Vakharia's staff privileges and further that neither the committee nor its members have the authority to grant the relief sought in Count IV.

We find the individual defendants' argument unpersuasive to the extent that the defendants disclaim involvement in the alleged discriminatory conduct. Although the Committee, pursuant to the Medical Staff Bylaws, is charged only with making recommendations to the Hospital's Board of Directors regarding hiring, renewal, and suspension decisions, the conduct complained of in Vakharia's count IV is not limited to the ultimate decision to terminate Vakharia's privileges. We agree, however, that the individual defendants should be dismissed from this action because they could not effect the relief that Vakharia seeks in Count IV.

Rule 21 of the Federal Rules of Civil Procedure is the proper vehicle for dismissing parties who were improperly joined—either because they fail to satisfy any of the conditions of permissive joinder under Fed. R.Civ.P. 20(a) or because "no relief is demanded from ... or no claim of relief is stated against [them]." 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1683, at 443–44; *American Fidelity Fire Ins. Co. v. Construcciones Werl, Inc.,* 407 F.Supp. 164, 190 (D.V.I. 1975). Although the individual defendants frame their motion as a motion to dismiss pursuant to Rule 12(b)(6), Vakharia does not object to this characterization and suffers no prejudice from it, and therefore we will interpret it as a Rule 21 motion.

In her complaint, Vakharia requests this court to "order the Hospital to expunge Dr. Vakharia's suspension and the ASA [American Society of Anesthesiologists] Report from her records and reinstate her to the Medical Staff" and to grant other relief as we deem proper. On its face, then, the complaint indicates that the requested relief does not implicate the individual defendants. And although Vakharia asserts in her memorandum that, according to the Bylaws, reinstatement and expunging her records would require the involvement of the Executive Committee, she does not indicate which Bylaws call for this participation or what kind and how much involvement is necessary. Even if the court were to order a new hearing on Vakharia's suspension, which would involve the individual defendants to a degree, the Hospital would be charged with ordering a new hearing and the Executive Committee would merely execute the order. Under the Bylaws, the Executive Committee appoints a hearing committee and administers the hearing process *when a staff physician requests a hearing;* the Executive Committee does not initiate the process. The Executive Committee is simply not a necessary party to effect the relief requested in Count IV, and the complaint is therefore dismissed as

to the individual defendants. *See Hispanic Coalition on Reapportionment v. Legislative Reapportionment Comm'n,* 536 F.Supp. 578, 583–84 (E.D.Pa.), *aff'd,* 459 U.S. 801, 103 S.Ct. 32, 74 L.Ed.2d 46 (1982).

D. *Motion to Quash*

In addition to the motions to dismiss, defendant Swedish Covenant Hospital, joined by the American Society of Anesthesiologists ("ASA"), has filed a motion to quash the subpoena served by Vakharia on the Custodian of Records of the ASA. Although not a party to this lawsuit, the ASA conducted, in April 1989, a review of some or all (the facts are disputed) of the Hospital's anesthesiologists. Upon receipt of the ASA's report, Vakharia contends, her staff privileges were suspended. Vakharia claims that the ASA review was partial and unfair for a number of reasons, and in the subpoena, she seeks virtually all documents relating to this review. The Hospital claims that much of the requested material is both privileged under the Illinois Medical Studies Act, Ill.Rev.Stat. ch. 110, para. 8–2101 *et seq.* (1989), and irrelevant under established Illinois caselaw. *See Adkins v. Sarah Bush Lincoln Health Center,* 129 Ill.2d 497, 514, 136 Ill.Dec. 47, 55, 544 N.E.2d 733, 741 (1989).

 The Hospital's argument is premised on the assumption that the federal law claims of Counts I, II, and III, are irrelevant for discovery purposes because they are challenged by the motions to dismiss. The Hospital asserts that only Count IV, which is governed by state law, remains, and therefore state law privilege principles should be applied. This memorandum and order, however, establishes that Vakharia's Title VII and ADEA claims, and part of her section 1981 claim, survive defendants' motion to dismiss, and at least parts of the ASA review are likely relevant to those claims. With respect to questions of privilege, Rule 501 of the Federal Rules of Evidence direct courts to apply "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience" unless the underlying claim or defense is governed by state law, in which case the privilege question "shall be determined in accordance with State law," *see Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061 (7th Cir. 1981); *Chawla v. Klapper,* 743 F.Supp. 1284, 1286 n. 2 (N.D.Ill.1990) ("State law privileges against discovery do not govern in federal claims"); it is quite clear, then, that the state law principles of privilege asserted by the Hospital do not control the issue of whether Vakharia's subpoena should be quashed, although they are not to be completely disregarded. *See Memorial Hospital,* 664 F.2d at 1061.

 Rather, this court must apply principles of the common law and is guided by several decisions of the Seventh circuit and Supreme Court that set forth a general framework for deciding questions of privilege:

First, because evidentiary privileges operate to exclude relevant evidence and thereby block the judicial fact-finding function, they are not favored and, where recognized, must be narrowly construed. *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). Second, in deciding whether the privilege asserted should be recognized, it is important to take into account the particular factual circumstances of the case in which the issue arises. The court should "weigh the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." *Ryan [v. Commissioner of Internal Revenue,* 568 F.2d 531, 543 (7th Cir.1977)].

*Memorial Hospital,* 664 F.2d at 1061–62. In an effort to persuade us that the object of Vakharia's subpoena is privileged under Illinois law, the Hospital fails even to suggest that the material would also be privileged under the *Ryan* analysis. We therefore need not reach that issue, and we deny the Hospital's motion to quash. We note at this point, however, that because the charges of discrimination are levelled not

against the ASA but against the Hospital, the relevance of much of the information sought is questionable. The Hospital's decision to suspend Vakharia was predicated on the ASA's final report and conclusions. Any procedural discrimination attending the ASA review that was not reflected in the final report would not have affected the Hospital's conduct. The Hospital is entitled to rely on the conclusions of the ASA to the extent that those conclusions appear on their face and in light of the other information disclosed to the Hospital to be fair and objective.

However the privilege issue is ultimately resolved, moreover, the parties should keep in mind that questions of confidentiality also come into play. Material relating to doctors that is sought purely for comparative purposes, for example, may be confined to private inspection and foreclosed from public disclosure.

### E. *Propriety of Vakharia's Surreply*

In connection with the motion to quash the subpoena, Vakharia filed a surreply memorandum addressing issues that she claims were raised for the first time in the Hospital's reply memorandum. Although Vakharia asserts that she received from this court leave to file the surreply, the Hospital contends in a motion to strike that such leave was not obtained. Whether or not Vakharia's surreply is improperly before this court we need not decide, for the arguments made in that filing, which related to the state law privilege issues raised by the Hospital, in no way influenced our decision on the motion to quash.

 An additional issue brought up in the Hospital's motion to strike, however, warrants our attention. The Hospital surmises, based on Vakharia's response and surreply memoranda, that Vakharia is receiving significant legal assistance from a lawyer. This lawyer, the Hospital continues, is ethically and legally obliged to file an appearance with this court and to sign the pleadings that he has drafted. We agree with the Hospital that Vakharia's filings suggest that she may be assisted by a lawyer, and that this individual ought to file an appearance and sign Vakharia's filings. Rather than base accusations on speculation, however, the Hospital should first ask Vakharia whether its conjectures are true; if they are, and if Vakharia's lawyer remains covert, the issue can be pursued in court.

### CONCLUSION

For the foregoing reasons, the motion to dismiss Vakharia's Title VII and ADEA claims is denied, the motion to dismiss her section 1981 claim is granted in part and denied in part, and the individual defendants are dismissed from the case. The Hospital and ASA's motion to quash is denied.