George W. MOORE, Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

No. 92 C 1130.

United States District Court,
N.D. Illinois.
Eastern Division.

Sept. 22, 1995.

Steven Owen Ross, Law Offices of Steven O. Ross, Chicago, IL, Joshua Sidney Hyman, Chicago, IL, for George W. Moore.

James W. Gladden, Jr., Marian Conroy Haney, Mayer, Brown & Platt, Chicago, IL, Andrew John Boling, Gerald L. Maatman, Jr., Baker & McKenzie, Chicago, IL, for Ford Motor Company.

Thomas H. Neuckranz, Manya Pastalan Grant, Edward Otto Pacer, Williams & Montgomery, Chicago, IL, Robert J. Peters, Brown & Peters, Chicago, IL, for Monty Sher.

David Michael Jankura, Ariel Weissberg, Charles A. Linn, Edwin A. Gausselin, Weissberg and Associates, Ltd., Chicago, IL, for Barry Sher.

Thomas H. Neuckranz, Manya Pastalan Grant, Chicago, IL, for Kenneth Weinberger.

## MEMORANDUM ORDER AND OPINION

GETTLEMAN, District Judge.

Plaintiff George W. Moore filed his original complaint on February 13, 1992, against defendant Ford Motor Company ("Ford") alleging that Ford: (1) violated the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. (the "ADEA") (Count I); and, (2) breached an oral contract to give plaintiff financial assistance to purchase a Ford dealership (Count II). Subsequently, plaintiff filed a First Amended Complaint, a Second Amended Complaint, and on March 3, 1995, filed an Amendment to the Second Amended Complaint.[1]

In his Second Amended Complaint plaintiff alleges that Ford: (1) violated the ADEA when it did not allow plaintiff into its Minority Dealer Training Program (the "Training Program") and did not provide plaintiff with financial assistance to purchase a dealership (Count I); (2) willfully and knowingly showed reckless disregard for whether its conduct was prohibited by the ADEA (Count II); and (3) breached an oral contract in which Ford allegedly promised plaintiff that it would award him a new dealership (Count III). In the Amendment to the Second Amended Complaint plaintiff added a claim against Ford alleging promissory estoppel based on Ford's alleged promise to finance and award plaintiff a Ford dealership. Ford has filed a summary judgment motion addressing all of plaintiff's claims.

## FACTS

Plaintiff was born in 1944, and began working in the automobile business in 1971 at Al Abrahms Pontiac. Plaintiff worked for various automobile agencies as a sales manager, salesperson and finance manager over the next nine years. In 1980, plaintiff went to work at Rogers Pontiac as a general sales manager.

In early 1989, while working at Rogers Pontiac, plaintiff contacted Ford and requested a dealership application. On March 29, 1989, plaintiff filled out a Ford prospective dealer application. In this application plaintiff stated that he would operate any dealership Ford awarded to him as a sole proprietorship under the name "George Moore," and would do business under the name "Moore Ford." In April 1989, plaintiff met with Thomas Catanese ("Catanese"), Ford's market representation manager. In this meeting Catanese told plaintiff that Ford was considering building a store in the Chicago suburbs, but would not tell plaintiff the exact location of the store.

On May 14, 1989, plaintiff was discharged from Rogers Pontiac. Plaintiff alleges that he was fired at this time because he was unable to make a deal with Ford to help purchase a Ford dealership. Following his termination, between the end of May and July 1989, plaintiff met and spoke with Catanese and Edward Moneagle ("Moneagle"), a Ford regional market representation manager, at different times. Throughout these conversations Catanese told plaintiff that: (1) plaintiff would need 12½% of the capitalized

[1]. The Second Amended Complaint alleges claims against Ford, Monty Sher, Barry Sher, and Kenneth Weinberger. In an Order and Opinion dated April 28, 1994, the court granted summary judgment to defendant Barry Sher for all claims pending against him in the Second Amended Complaint. On May 12, 1995, plaintiff dismissed his claims against defendants Monty Sher and Kenneth Weinberger. Accordingly, Ford is the only remaining defendant in this case.

cost or approximately $100,000.00 to get a dealership; (2) the earlier discussed dealership was going to be built in Aurora; (3) if the Aurora dealership was not built, Ford would finance another location for plaintiff. Also during these conversations, plaintiff told Catanese that he would have to sell his house to raise the required capital. Plaintiff did not put his house up for sale or tender any money to Catanese or Ford.

In November or December, 1989, plaintiff found out that he did not get the Aurora, Illinois, Ford dealership. Ford awarded the Aurora dealership to Ray Fregia ("Fregia"), a minority, and Joseph Hennessey ("Hennessey"). When they received the dealership, Fregia had been a Ford employee for eighteen years and Hennessey had owned and operated a successful Ford dealership in the Chicago area for twenty-five years.

## DISCUSSION

■ Under Fed.R.Civ.P. 56(c), a court should grant a summary judgement motion if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of a genuine issue of material fact. *Id.; Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

■ The opposing party must set forth specific facts, through affidavits or other materials, that demonstrate disputed material facts. *Liberty Lobby, Inc.,* 477 U.S. at 256, 106 S.Ct. at 2514. When reviewing a summary judgement motion, the court must read the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but

instead to determine whether there is a genuine issue of triable fact." *Doe v. R.R. Donnelley & Sons Company,* 42 F.3d 439, 443 (7th Cir.1994).

Plaintiff alleges that defendant violated the ADEA in two ways: (1) when it denied him financial assistance to purchase a Ford dealership; and, (2) when Ford did not allow him entry into the Training Program. Because the timing and facts surrounding each of these issues differ, the court will address them separately.

## ADEA FINANCIAL ASSISTANCE CLAIM

■ Defendant asserts that plaintiff's financial assistance claim fails as a matter of law because there is no employer-employee relationship between plaintiff and defendant and, therefore, plaintiff cannot recover for any of plaintiff's alleged actions under the ADEA.[2] The ADEA prohibits age discrimination by employers, employment agencies, and labor organizations. 29 U.S.C. § 623. Ford asserts that it is not an employment agency or a labor organization, and that it does not have an employer-employee relationship with people to whom it gives financial assistance to purchase Ford dealerships. In its original brief and reply brief Ford did not explain what relationship it had with the people to whom it gave financial assistance. Plaintiff responded that while the relationship is not technically an employer-employee relationship, it is "similar" to such a relationship because Ford has established criteria for who it allows to become a Ford dealer.

After the parties filed their initial summary judgment briefs the court ordered further briefs from the parties addressing whether there is an employer-employee relationship between Ford and its dealership owners that receive Ford's financial assistance and people who are placed in its training program. Under Ford's financial assistance program Ford invests a substantial portion of the required capital needed for a dealership along with the individual operator.

---

**2.** Defendant also asserts that plaintiff violated the statute of limitations for filing an ADEA claim with the EEOC and for filing in federal court. Because the court finds that plaintiff fails to state a viable claim under the ADEA, the court will not address these remaining arguments.

The dealership is organized as a Delaware corporation. Ford and the individual operator are the stockholders of the dealership corporation. The individual operator has full authority to administer the affairs of the dealership, and uses the corporate profits of the dealership to retire Ford's ownership interest in the dealership. Once Ford's interest is retired, the operator becomes the sole proprietor in the dealership.

In determining whether a business relationship is one of employer-employee the Seventh Circuit examines the "economic realities of the relationship and the degree of control the employer exercises over the alleged employee." *Rogers v. Sugar Tree Products, Inc.*, 7 F.3d 577, 581 (7th Cir.1993). If the party shares in the firm's management, control and ownership he or she is not considered an employee. *Fountain v. Metcalf, Zima & Co.*, 925 F.2d 1398 (11th Cir. 1991) (member/shareholder in a professional corporation is not an employee); *Wheeler v. Hurdman*, 825 F.2d 257 (10th Cir.1987) (general partner in a partnership is not an employee); *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177 (7th Cir.1984) (shareholder in a professional corporation is not considered an employee under Title VII). The court finds that under the terms of the relationship between Ford and its financed dealership operators there is no employer-employee relationship because a dealer/proprietor exercises too much independence to be considered an employee of the automobile manufacturer.

In his supplemental brief plaintiff argues that even if there is no employer-employee relationship the court can find an ADEA violation if the court finds that Ford unlawfully interfered with plaintiff's access to employment benefits. Plaintiff argues that because Ford denied plaintiff financing, it interfered with his right to obtain employment benefits from being an owner of a Ford dealership. There are no allegations in any of plaintiff's complaints that Ford interfered with plaintiff's access to employment benefits. Further, in order to have jurisdiction over a plaintiff's claim of an "indirect employment relationship" with the defendant the plaintiff is required to show that the defendant had access to and interfered with an existing employee relationship between the plaintiff and a third party. *Vakharia v. Swedish Covenant Hosp.*, 765 F.Supp. 461, 464–466 (N.D.Ill.1991). As set forth above, the court does not find that a Ford dealership owner/operator is an employee of the dealership. Accordingly, plaintiff's argument that Ford interfered with plaintiff's access to employment benefits he may have acquired through a dealership fails to allege proper jurisdiction under the ADEA.

For the first time in his supplemental brief plaintiff asserts that defendant is an employment agency under the ADEA. An employment agency is defined in 29 U.S.C. § 630(c), which provides in part:

> The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer and includes an agent of such a person . . .

Plaintiff argues, without evidentiary support, that Ford acts as an employment agency because it chooses candidates for its Training Program and assigns them to work and train under a Ford dealer who is considered the candidate's employer. Even if such placements were considered acts of an employment agency (an unlikely conclusion), plaintiff has failed to produce any evidence that Ford "regularly undertakes" such actions. There is no evidence that even one person was accepted into the Training Program during the relevant period alleged in the complaint. Accordingly, the court finds that Ford is not an "employment agency" as defined under the ADEA § 630(c).

Plaintiff's final argument is that for public policy reasons this court should address whether defendant discriminated against plaintiff based on his age regardless of whether an employer-employee relationship exists. The ADEA prohibits "employers" from discriminating against "employees" based on the employee's age. It does not include prohibiting any business entity from discriminating in any business relationships based on age. Whether the ADEA should be amended to include claims from parties in plaintiff's position "is a question for Congress, not the courts." See, *Hayden v. La–*

*Z–Boy Chair Co.,* 9 F.3d 617 at 622 (7th Cir.1993).

## ADEA TRAINING PROGRAM CLAIM

In addition to the arguments addressed above, Ford claims that plaintiff fails to state an ADEA claim for Ford's failure to allow him into the Training Program because plaintiff's Minority Training related claim is barred by the statute of limitations.

 The administrative statute of limitations for an ADEA claim is 300 days for cases filed in Illinois. *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446 (7th Cir. 1990). A cause of action for discrimination accrues when an employee becomes aware of the action that is the basis for his ADEA claim. *Id;* citing, *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (the plaintiff's cause of action accrued when he was denied tenure allegedly on discriminatory grounds, not when his employment contract expired a year later). "Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given grudging application. They protect important social interests in certainty, accuracy, and repose." *Cada,* 920 F.2d at 452–453 (court affirmed that the plaintiff's ADEA claims were time barred because he failed to file his claim within 300 days and failed to establish that the limitations should be tolled).

Plaintiff last sought entry into the Training Program in January 1990.[3] Plaintiff filed an ADEA charge against Ford with the EEOC on December 24, 1991, more than 300 days later. In *Cada,* the court explained that federal courts can toll the statute of limitations under one of two doctrines: (1) equitable estoppel, "which comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations"; and, (2) equitable tolling that "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." 920 F.2d at 450–451. Plaintiff fails to assert any reason why either of the tolling doctrines should be applied in this case. Accordingly, the court finds that plaintiff's Training Program ADEA claim is barred by the statute of limitations.

## BREACH OF CONTRACT

Plaintiff asserts that during his conversations with Catanese between May 1989 and July 1989, Catanese, acting as Ford's agent, entered into an oral contract with plaintiff requiring Ford to finance a Ford dealership with plaintiff in Aurora, Illinois, or in another location. Ford argues that plaintiff fails to state a breach of contract claim because there are insufficient terms for the court to find that a contract existed. Alternatively, Ford argues that if the court finds that a contract existed, plaintiff's claim must fail because plaintiff did not perform his required contractual obligations.

 Under Illinois law, in a breach of contract action the plaintiff must establish by a preponderance of the evidence an offer and acceptance, consideration, definite and certain terms of the contract, plaintiff's performance of all required contractual conditions, the defendant's breach of the terms of the contract, and damages resulting from the breach. *Mannion v. Stallings & Co., Inc.,* 204 Ill.App.3d 179, 186, 149 Ill.Dec. 438, 442, 561 N.E.2d 1134, 1138 (1st Dist.1990). "To be enforceable the contract must be so definite and so certain in all of its terms that a court can require the specific thing contract-

---

**3.** In his Local Rule 12(N) statement, plaintiff denies that he last asked about enrolling in the Training Program in January 1990, and cites page 62 of his March 2, 1993, deposition testimony where he stated that he asked about enrolling in the Training Program on several occasions between January 1990, and April 1991. As Ford points out, three pages later in that deposition, plaintiff admits that he was getting confused between the Training Program and the financial assistance program. In plaintiff's deposition taken on August 17, 1994, plaintiff clarified that while he had asked about financing in April 1991, the last time he asked anyone at Ford about the Training Program was in January 1990. Based on the evidence before it, the court finds that plaintiff's admitted confusion between the programs explains the conflict between his earlier and more recent deposition testimony, and concludes that plaintiff admitted in his 1994 deposition that the last time he sought entry into the Training Program was in January 1990.

ed for to be done." *Murray v. ABT Associates, Inc.*, 1993 WL 317258 *5 (N.D.Ill.1993), aff'd, 18 F.3d 1376 (7th Cir.1994), quoting, *Morey v. Hoffman*, 12 Ill.2d 125, 130, 145 N.E.2d 644 (1957).

■ Catanese told plaintiff that if he came up with 12½% or approximately $100,000 Ford would finance a dealership with plaintiff either in Aurora or another location.[4] Moore accepted this offer, and in his Prospective Dealer Application, stated that he would operate any dealership awarded to him as a sole proprietorship. The court finds that these facts are clear enough for the court to order the contract performed: plaintiff must put up 12½% or $100,000 and Ford must provide plaintiff with financing for a dealership in Aurora, Illinois, or another location. The consideration to Ford is plaintiff's promise to manage and operate the dealership.

■ Ford argues in the alternative that plaintiff's claim must fail because plaintiff did not perform his obligations under the contract. Ford argues that plaintiff never had, never gave to Ford, and cannot currently come up with $100,000 as called for under the alleged contract. In his deposition, plaintiff testified that during one of his meetings with Catanese, Catanese asked plaintiff if he would consider putting some of the $100,000 in escrow. Plaintiff stated that he agreed to do this but Catanese then told him that it was not necessary. Plaintiff testified that he was never given a date to come up with the money, and that he was waiting for Ford to confirm which dealership plaintiff would get and when it would happen.

There is conflicting evidence whether plaintiff had or has $100,000 to put into a

dealership: (1) the report from the credit check Ford ran on plaintiff in April 1989, states that plaintiff's net worth at that time was $139,000; (2) plaintiff concedes that in order to come up with the $100,000 he would have had to sell his home[5] and that he never put his home on the market; (3) the April 1989, credit report states that plaintiff's "parents are retired," and that the credit agent was "advised that there would be no financial help from his parents or from his wife's parents"; (4) in an affidavit dated April 22, 1995, plaintiff's father states that he gave plaintiff $30,000 in 1989, and that he is prepared to give plaintiff money in the event that it is needed to acquire a dealership.

■ In order to seek specific performance of a contract or seek recovery for damages from the breach of a contract plaintiff must establish that he has always been ready, willing and able to perform the contract on his part. See, *Arnold v. Leahy Home Bldg. Co., Inc.*, 95 Ill.App.3d 501, 507, 51 Ill.Dec. 285, 289, 420 N.E.2d 699, 703 (2nd Dist.1981) (establishing this requirement for specific performance); *Izzo v. City of Loves Park*, 20 Ill.App.2d 117, 124, 155 N.E.2d 312, 317 (1959) (a plaintiff that is ready and willing to perform a contract, makes preparation to perform on his part, and is prevented from performing by the other party, can recover all damages suffered by him by reason of the default of the party). Although plaintiff's evidence is questionable, the court finds that there is a genuine issue of fact whether plaintiff was ready, willing, and able to perform the conditions of the contract. Accordingly, the court denies Ford's motion for summary judgment on plaintiff's breach of contract claim.

**4.** In plaintiff's deposition dated March 6, 1995, plaintiff also stated that he and Catanese discussed: (1) that plaintiff would not be hiring a manager because he was going to manage the Aurora dealership himself; (2) that plaintiff had to utilize Ford's insurance because he was going to be receiving Ford financing; (3) that plaintiff was going to receive a salary; (4) that plaintiff would be entitled to take a bonus the first year and would apply any bonus to which he was entitled to pay off a portion of the financing debt owed to Ford; and (5) that plaintiff would wait for the Aurora dealership and would not continue further negotiations with non-Ford dealer-

ships. This testimony, however, directly conflicts with plaintiff's earlier deposition taken on August 17, 1994, in which plaintiff stated that the only terms of the purchase of the Aurora dealership that he was aware of was that plaintiff would have to come up with 12½% of the capitalized cost or $100,000, and, in fact, plaintiff was never told that the Aurora dealership was going to be built.

**5.** As of June 1989 plaintiff had mortgages totalling $304,00 on his home that was valued at $369,000.

**1300**

## Promissory Estoppel

■ The parties agree that in order to establish a promissory estoppel claim plaintiff must prove: (1) that Ford made an unambiguous promise; (2) that plaintiff relied on such promise; (3) that plaintiff's reliance was expected and foreseeable by Ford; and, (4) that plaintiff relied on Ford's promise to his detriment. *Goldberg v. Collins Tuttle & Company,* 264 Ill.App.3d 878, 202 Ill.Dec. 367, 637 N.E.2d 1103 (1st Dist.1994).

■ Plaintiff asserts that in June 1989, Catanese promised that if plaintiff came up with $100,000 or 12½% of the capitalized cost of a dealership Ford would finance a dealership for plaintiff in Aurora, or that if the Aurora dealership was not built Ford would finance a dealership for plaintiff in another location. Ford argues that the alleged promise is too ambiguous to state a claim of promissory estoppel. There is no evidence before the court how these types of dealership financing deals take place. As stated above, the court finds that Catanese's offer of a dealership if plaintiff could come up with 12½% or $100,000 is not ambiguous. Based on the evidence before it, the court finds that plaintiff has established proof of an unambiguous promise.

■ Having found a promise, plaintiff must still show that he relied on the promise to his detriment. By December 1989, plaintiff was told that he would not receive the Aurora dealership and that Ford's policy was that it would not finance dealerships to people who had not gone through the Training Program. Further, plaintiff admits that he did not believe that Catanese had authority to award him a dealership. In his deposition on August 17, 1994, plaintiff stated:

"I don't blame Mr. Catanese because I think it was completely out of his hands, completely ... I think that there was in fact a policy change and I was caught in the middle ..."

The court finds, therefore, that because plaintiff did not go through the Training Program and admits that he believed that Catanese did not have authority to choose what candidate Ford financed, plaintiff could not have reasonably relied on Catanese's promise after December 1989, when he was told that he was not awarded the dealership. Accordingly, plaintiff must establish that between June 1989, and December 1989, he detrimentally relied on Catanese's promise and that plaintiff's reliance was reasonably foreseeable by Ford.

In his complaint, plaintiff asserts that in reasonable reliance on Ford's promise he ceased pursuing other "non-Ford" dealership opportunities. In his deposition taken on March 2, 1993, plaintiff testified that around April 1989, he met with Don Gowan, a zone manager for Pontiac, who told him that he was qualified to get a dealership but there were no stores available at that time. Following this discussion plaintiff spoke to Roger Whorell ("Whorell"), a Pontiac dealer who was in charge of dealer development at Pontiac. Whorell called plaintiff and told him which Pontiac stores were available in the United States. Plaintiff stated in his March 1993 deposition that when Whorell made plaintiff several verbal offers for Pontiac dealerships, he turned down the offers because he did not care for the locations.

After plaintiff added his promissory estoppel claim Ford redeposed him on the issues raised in the newly alleged claim. In his March 1995 deposition plaintiff testified that Whorell made plaintiff a verbal offer for a Phoenix, Arizona store. Plaintiff stated that he did not look into the Phoenix location because he had already made the deal with Catanese at Ford. Ford argues that this testimony directly contradicts his earlier March 1993 testimony because plaintiff previously testified that Pontiac never offered him any dealership, and that plaintiff had never previously mentioned an offer from Pontiac of a dealership in Phoenix. Plaintiff had, however, previously stated in his March 1993 deposition that although Pontiac never gave him a firm offer for a dealership, Whorell orally offered him dealerships in various locations "that I didn't care for."

The court does not find that this testimony is wholly inconsistent. In essence, plaintiff has testified that although Pontiac had made no firm offers of a dealership in any location that interested plaintiff, he forewent all potential opportunities with Pontiac in reliance

on the deal he thought he had with Ford. The court notes, however, that plaintiff has the burden of proving: (1) that Pontiac dealerships were available in locations that would have been suitable to plaintiff; (2) that plaintiff met Pontiac's dealer qualifications; and (3) that Pontiac would have made plaintiff a firm offer. Plaintiff will also have to explain to the trier of fact why he failed to mention the Phoenix location in his earlier deposition, among other things. Ford's arguments concerning the implausibility of many of plaintiff's claims should also be made to the trier of fact. Based on the evidence before it, the court finds that there is a genuine issue of fact whether plaintiff detrimentally relied on Catanese's promise.

Ford also argues that plaintiff cannot establish that he reasonably relied on Catanese's promise because: (1) during the time at issue plaintiff had not come up with the required money; (2) plaintiff cannot establish a genuine issue of fact that he turned down a Pontiac dealership in reliance on the promise because he had previously testified that he turned down Pontiac dealerships because of the stores' locales; (3) plaintiff could not have reasonably relied on Catanese's promise because it is unclear that Catanese or Moneagle had authority to promise plaintiff a dealership. As stated above, based on the evidence before it, the court finds that there is a genuine issue of fact whether plaintiff could have raised the $100,000.

Addressing Ford's second argument, plaintiff testified in his March 1993, deposition that when he met with Dan Gowen he told him that he had given Ford an application and that even if Pontiac came up with a dealership offer, plaintiff was going to take the best location he could get. This testimony, in addition to the evidence of plaintiff's detrimental reliance stated above, raises a genuine issue as to whether plaintiff reasonably relied on Catanese's promise when he turned down the Pontiac dealerships.

Ford also argues that plaintiff cannot claim that he reasonably relied on Catanese's and Moneagle's promise because he admitted in his deposition that he does not know if they had authority to make the final decision. Plaintiff stated that during the time at issue,

he assumed that Catanese and Moneagle had the authority to promise him a dealership. Without further evidence of plaintiff's general knowledge of who had authority to enter Ford into a dealership financing contract, what authority Catanese and Moneagle had, and what authority plaintiff believed that Catanese and Moneagle had, the court finds that there is a genuine issue of fact whether plaintiff reasonably relied on Catanese's promise.

Finally, Ford argues that plaintiff's reliance on Catanese's promise could not have been expected or foreseeable by Ford because: (1) plaintiff never tendered the required funds to Ford; (2) plaintiff never put his house up for sale; and, (3) plaintiff never gave Ford proof that he had the money. As noted above, when Catanese asked plaintiff if he was willing to put money into escrow he told Catanese that he would, and Catanese told plaintiff that it was not necessary. The court notes that Catanese is a manager for Ford. Based on the limited evidence before the court on this issue, the court finds that there is a genuine issue of fact whether plaintiff's reliance on Catanese's offer was foreseeable by Ford.

The court finds that plaintiff has raised genuine issues of fact in opposition to Ford's summary judgment motion on plaintiff's promissory estoppel claim. Accordingly, the court denies summary judgment on this count. The court notes once again that plaintiff is on Rule 11 and Rule 37 notice for plaintiff's March 1995 deposition testimony relating to this claim. The court's denial of summary judgment and finding that plaintiff's testimony is not wholly inconsistent with his previous deposition testimony does not mean that plaintiff is not open to sanctions if there is evidence that his March 1995, testimony, or any other part of his case, was fabricated. The court will not make such a determination at this time.

## CONCLUSION

For the reasons stated above, the court grants in part and denies in part Ford's motion for summary judgment. The court grants Ford summary judgment and dismisses plaintiff's ADEA related claims because

plaintiff fails to state a claim for an ADEA violation against Ford for failing to provide him with financing and is barred by the statute of limitations from bringing his claim against Ford for failing to allow plaintiff into the Training Program. The court denies, however, Ford's motion for summary judgment on plaintiff's breach of contract and promissory estoppel claims because plaintiff has raised various genuine issues of material fact related to each of these claims.