**Dr. Mark F. ALEXANDER, Plaintiff,**

v.

**RUSH NORTH SHORE MEDICAL CENTER, Defendant.**

No. 92 C 6125.

United States District Court,
N.D. Illinois,
Eastern Division.

May 6, 1994.

Ayesha Salima Hakeem, Waukegan, IL, for plaintiff.

Sidney I. Schenkier, Terrence Joseph Truax, Jenner & Block, Chicago, IL, for defendant.

### *MEMORANDUM OPINION & ORDER*

ALESIA, District Judge.

The plaintiff, Dr. Mark Alexander, filed suit in this court alleging that the defendant, Rush North Shore Medical Center ("Rush" or "the hospital") violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") by terminating his staff privileges at Rush. Rush moves this court for summary judgment, arguing that (1) Title VII does not protect Dr. Alexander because he is not an employee of defendant and (2) as a matter of law, Dr. Alexander cannot demonstrate that Rush considered Dr. Alexander's race, color, or religion when it revoked his staff privileges. For the reasons set

forth below, this court grants Rush's motion in part and denies it in part.

## I. *STATEMENT OF FACTS*

From 1976 to 1988, Dr. Alexander, an anesthesiologist, enjoyed staff privileges at Rush. (Plaintiff's Additional Facts Requiring Denial of Summary Judgment ("Pl.'s 12(n) Stmt.") at ¶ 1) As part of the responsibilities of maintaining staff privileges at Rush, an anesthesiologist must spend a portion of his time "on-call." (*Id.* at ¶ 4) If an emergency room doctor requests an on-call doctor to go to the hospital and to assist with a patient, the doctor must comply with the request as a condition of maintaining staff privileges. (*Id.*) Rush terminated Dr. Alexander's privileges because, Rush asserts, he failed to comply with such a request on February 20, 1988. (Mot. for Sum.J. at ¶ 3)

On February 20, 1988, an emergency room physician, Dr. Patricia Bitter, was treating a patient who suffered a head wound. (Stmt. of Undisputed Facts in Support of Defendant's Motion ("Def.'s 12(m) Stmt.") at ¶ 13) Dr. Bitter was concerned that the patient's breathing would become obstructed. (*Id.* at ¶ 14) She therefore attempted to secure an airway for the patient by performing an endotracheal intubation. (*Id.* at ¶ 15) After her unsuccessful attempt to intubate, she contacted Dr. Alexander, who was the on-call anesthesiologist. (*Id.* at ¶¶ 17, 21) Dr. Bitter alleges that she requested Dr. Alexander to come to the hospital to assist, and he refused. (*Id.* at ¶¶ 24–26) Dr. Alexander has consistently contended that Dr. Bitter never requested his presence. (Pl.'s 12(n) Stmt. at ¶ 10; Plaintiff's First Amended Complaint ("Compl.") at ¶ 16)

After this conversation, Dr. Bitter spoke with Dr. Upendranath Nimmagadda. (Def.'s 12(m) Stmt. at ¶ 19) According to Dr. Nimmagadda, Dr. Bitter told him that the anesthesiologist refused to assist her after he had apprised her that Rush did not own a suitable fiberoptic laryngoscope. (*Id.,* Exhibit C, tab 11 (Dr. Nimmagadda's letter to the hospital describing the incident 3 days after its occurrence); deposition testimony of Nimmagadda at 60–61) Dr. Bitter expressed her exasperation at her inability to procure assis-

tance for the patient by exclaiming "no body wants to come here to help." (Def.'s 12(m) Stmt., Ex. C, tab 11) Dr. Nimmagadda went to the hospital and performed a tracheotomy on the patient. (*Id.*)

Meanwhile, Dr. Alexander had too contacted another medical professional associated with the hospital. Dr. Alexander contacted the respiratory therapist, Jake Strykowski. According to Strykowski, Dr. Alexander asked Strykowski whether the patient "really needed" Dr. Alexander's help. (Dep. of Strykowski at 45) Strykowski told him that the patient was becoming increasingly unresponsive and they called Dr. Alexander because of their inability to secure an airway through intubation. (*Id.* at 44, 76–77) Dr. Alexander advised Strykowski that he did not have experience with the type of flexible fiberoptic equipment that Rush used. (Def.'s 12(m) Stmt. at ¶ 33) Strykowski contends that he then told Dr. Alexander that Rush did in fact have the equipment with which Dr. Alexander has experience, and the conversation terminated. (Dep. of Strykowski at ¶¶ 12, 46, 66) Dr. Alexander did not contact anyone else at the hospital that evening and did not go to the hospital to assist with the patient. (Def.'s 12(m) Stmt. at 27)

The next day, Dr. Bitter spoke to Dr. Abraham Chervony and lodged a complaint about the incident. (*Id.* at ¶¶ 11, 25) The hospital, through Dr. Chervony, investigated the allegations. (*Id.* at ¶ 30) The hospital gathered the statements of Drs. Bitter, Nimmagadda, Alexander, and Strykowski. (*Id.* at ¶¶ 30, 32, 39) Upon reviewing these written statements and listening to testimony, the Rush Medical Committee Board ("MCB") agreed with Dr. Bitter and concluded that she had requested Dr. Alexander's assistance. (*Id.* at ¶ 44) Consequently, it voted to revoke Dr. Alexander's staff privileges. (*Id.* at ¶ 46) The Medical Appeals Board at the hospital agreed with the MCB's factual findings, yet believed revocation of staff privileges to be too harsh of a disciplinary measure. (*Id.* at ¶¶ 51–52) The Board of Trustees, the final decisionmaker, reviewed the evidence and also concluded that Dr. Alexander failed to respond to a request for assistance. (*Id.* at ¶¶ 47, 54) It, however, agreed

with the MCB as to the appropriate discipline and revoked his privileges. (*Id.*) Thus, approximately 32 people reviewed the evidence and concluded that Dr. Bitter summoned Dr. Alexander and Dr. Alexander refused. (*Id.* at ¶ 43) Dr. Alexander filed suit pursuant to Title VII, alleging that the hospital did not terminate his privileges because it believed Dr. Bitter's version of the incident, but rather, because he is Egyptian, because he is a member of the Muslim faith, and/or because the color of his skin is brown. After discovery, Rush filed this motion for summary judgment.

## II. *DISCUSSION*

### A. *Whether Title VII Protects Non-Employee Doctors against Discriminatory Decisions with Respect to Staff Privileges*

█ Rush first argues that because Dr. Alexander was not an employee of Rush, Title VII does not protect him from discrimination. Doctors, however, need not be employed by a hospital to merit protection under Title VII. *Doe v. St. Joseph's Hosp.*, 788 F.2d 411, 422–25 (7th Cir.1986); *Vakharia v. Swedish Covenant Hosp.*, 765 F.Supp. 461, 463–69 (N.D.Ill.1991); *Ellerby v. Illinois Circuit Court*, 46 Fair Emp.Prac. Cases (BNA) 524, 526, 1988 WL 235861 (N.D.Ill.1988); *cf. Pelech v. Klaff–Joss, LP*, 815 F.Supp. 260, 263 n. 3 (N.D.Ill.1993) (Judge Aspen noting that the Seventh Circuit in *dicta* has cast doubt as to the validity of *Doe*, but holding that District Courts are bound by *Doe* until the Seventh Circuit reexamines its position). A plaintiff-doctor merits Title VII protection if the hospital controlled the doctor's employment opportunities. *E.g., St. Joseph's Hosp.*, 788 F.2d at 423–24. A hospital controls these opportunities through the bequest of staff privileges; without these privileges, a doctor cannot treat the hospital's patients. *Vakharia*, 765 F.Supp. at 466–68. Thus, a hospital incurs Title VII liability by revoking staff privileges for discriminatory reasons. *Id.* at 466, 469 (expressly holding that Title VII prohibits a hospital from revoking the staff privileges of an anesthesiologist). Title

VII applies in this case because Rush revoked Dr. Alexander's staff privileges.

█ Rush responds by arguing that Alexander has not alleged any actionable employment relationship and a plaintiff cannot rely on facts outside of the pleadings on a motion for summary judgment. (Def.'s Reply Br. at 5 (citing *Samuels v. Wilder*, 871 F.2d 1346, 1349–50 (7th Cir.1989))) Dr. Alexander's complaint, however, does sufficiently plead an employment relationship with Rush's patients and subsequent interference with that relationship by Rush. *See* FED.R.CIV.P. 8(a) (requiring "short and plain statement"). Dr. Alexander alleges that he "worked exclusively for Rush patients." (Compl. at ¶ 14) He further alleges that "Rush at all times had the ability to terminate [him]" and that Rush did in fact terminate his staff privileges. (Compl. at ¶¶ 14, 17, 19, 22) This language conveys an allegation that Rush interfered with Dr. Alexander's relationship with the Rush patients, for whom he worked exclusively, by revoking his privileges. Thus, Rush's motion is denied as to the grounds that Dr. Alexander did not adequately allege an employment relationship with Rush patients.

### B. *Whether the Plaintiff Can Demonstrate that the Defendant Intentionally Discriminated Against Him Because it Terminated Him Without an Honest Belief as to His Misconduct*

█ Rush argues that it is entitled to judgment because, as a matter of law, Dr. Alexander cannot demonstrate that it intentionally discriminated against him. (Mot. for Sum.J. at ¶ 3) In a Title VII case based on a theory of disparate treatment, a plaintiff can establish a *prima facie* case by demonstrating by a preponderance of the evidence that (1) the plaintiff was a member of a protected class, (2) the plaintiff was meeting the employer's legitimate expectations, (3) but was nonetheless discharged, and (4) the employer sought a replacement. *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993). The parties do not dispute the satisfaction of elements one, three and four.

To demonstrate that he was meeting Rush's legitimate expectations,[1] Dr. Alexander contends that Dr. Bitter falsely accused him of failing to respond to her request for assistance. (Pl.'s Resp.Mem. at 10–11) Thus, he essentially argues that because her allegation is false, the incident did not occur. (*See id.*) Because the incident did not occur, he argues, he was meeting Rush's legitimate expectations and thus, has demonstrated a *prima facie* case of discrimination. (*See id.*)

■ Assuming, *arguendo*, Dr. Alexander has established a *prima facie* case, Rush can rebut the resulting inference of discrimination by articulating a legitimate, nondiscriminatory reason for the discharge. *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 371 (7th Cir.1992). Rush has sufficiently rebutted the presumption here. An employer terminates an employee for a legitimate, nondiscriminatory reason if it "honestly believed" that the alleged instance of misconduct occurred. *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir.1994); *Billups v. Methodist Hosp.*, 922 F.2d 1300, 1304 (7th Cir.1991). Here, Rush has consistently attested that it honestly believed the incident occurred, and moreover, that it still believes that Dr. Alexander refused Dr. Bitter's request for assistance. (Def.'s Mem. in Supp. at 12–13; Mot. for Sum.J. at ¶ 3; Def.'s Reply Br. at 10–11) In fact, through three levels of review involving 32 decisionmakers, Rush consistently maintained its belief in plaintiff's misconduct. Thus, Rush has met its burden of production. *See Lenoir*, 13 F.3d at 1133; *Billups*, 922 F.2d at 1304.

■ Dr. Alexander is now afforded the opportunity to show that Rush's proffered belief in his misconduct is pretextual. *McCoy*, 957 F.2d at 371. He can adduce such a showing by demonstrating that the hospital's explanation has no basis in fact or that the explanation is not the actual reason. *Lenoir*, 13 F.3d at 1133. A defendant can prevail on a motion for summary judgment by demonstrating that no genuine issue of material fact exists as to whether its belief in the plaintiff's guilt was honestly held and consequently, that the plaintiff cannot show pretext. *Id.*

In the instant case, Rush has shown that it harbored an honest belief. The only evidence adduced by Dr. Alexander to demonstrate that Rush did not have an honest belief is his own avowal that the incident did not occur. Yet the Seventh Circuit has held that as a matter of law, a plaintiff's statement, without more, denying the occurrence of the disputed incident is insufficient. *Billups*, 922 F.2d at 1303. Because plaintiff cannot rebut the evidence that 32 independent decisionmakers all reached the same good faith conclusion as to the events of February 20, 1988, he cannot demonstrate a genuine issue of material fact that defendant's honest belief in his misconduct is mere pretext.

Therefore, because Dr. Alexander failed to adduce evidence to rebut the defendant's showing of honest belief, Rush is entitled to summary judgment on this issue. Thus, at trial, the plaintiff cannot attempt to establish a Title VII violation case by presenting evidence that the incident did not occur.

**C. Whether the Plaintiff Can Demonstrate that the Defendant Intentionally Discriminated Against Him Because it Treated Similarly Situated Employees Outside of the Protected Class Differently**

■ Dr. Alexander argues that if the hospital did in fact harbor an honest belief as to Dr. Alexander's guilt, it nonetheless violated Title VII because it reacted discriminatorily to that belief. (Pl.'s Resp.Mem. at 11 n. 2) When the treatment of similarly situated employees is at issue, the plaintiff can establish a *prima facie* showing of discrimination by demonstrating that (1) plaintiff was a member of a protected class, (2) plaintiff was discharged although performing satisfactorily, and (3) the defendant treated similarly situated employees outside of the protected class more favorably. *Lenoir*, 13 F.3d at 1132; *Stotts v. Memphis Fire Dep't*, 858 F.2d 289, 301 (6th Cir.1988). The record shows

---

1. The plaintiff concedes that if he did in fact fail to respond to a request for assistance, then he failed to meet Rush's legitimate expectations.

(Pl.'s 12(n) Stmt. at ¶¶ 8, 23) Thus, the issue here is not the validity of Rush's reason, but rather, its factual basis.

that the parties do not dispute that Dr. Alexander is a member of the protected class, that Rush revoked his privileges or that he was performing his job satisfactorily until February 20th. The remaining issue is whether he has established that Rush has treated similarly situated employees outside of the protected class differently. Plaintiff alleges he is similarly situated to four doctors not in the protected class who were each treated more favorably.

### (1) *Dr. Britt*

Dr. Alexander first avers that he is similarly situated to Dr. Wilbur Britt. On the evening of February 20, Dr. Bitter had contacted another on-call doctor, Dr. Britt. Dr. Britt did not respond to the call because he had forgotten to carry his pager with him. (Pl.'s Resp.Mem. at 5; Def. Reply Br. at 12 n. 6) The effect of Dr. Britt's negligence is the same as Dr. Alexander's wilful refusal— an emergency room physician needed the assistance of an on-call physician who shirked his duties and left the emergency room physician and the patient unaided. However, as Rush notes, "commission" differs from "omission." (Def. Reply Br. at 12 n. 6) Dr. Alexander wilfully refused to assist the patient; Dr. Britt negligently forgot his pager and could not be contacted to assist the patient. It is no surprise and well within reason that Rush considered intentional wrongdoing as more egregious than carelessness. *See Stotts,* 858 F.2d at 301 n. 9. In Title VII cases, employees are not similarly situated when one acts intentionally and the other acts negligently. *Stotts,* 858 F.2d at 301 n. 9. Thus, the doctors' respective errors are not comparable.

Moreover, Dr. Alexander's misconduct differs from Dr. Britt's in another important aspect. When appraised of his error, Dr. Britt accepted full responsibility, apologized and assured Rush that the incident would not be repeated. (Pl.'s 12(n) Stmt., Ex. M (minutes of the Medical Executive Committee); Def. Reply Br. at 12 n. 6) When the hospital advised Dr. Britt of his discipline, a written reprimand, it noted that it was impressed by his acceptance of responsibility and assurances against future mishaps. (Pl.'s 12(n)

Stmt., Ex. M) Dr. Alexander, on the other hand, has consistently maintained that he did nothing wrong. (Pl.'s Resp.Mem. at 11) As previously discussed, the hospital honestly believed that Dr. Alexander refused a request for assistance. Thus, it could understandably discipline him more severely than it did Dr. Britt because it would appear to Rush that Dr. Alexander was attempting to escape culpability. Because Dr. Britt accepted responsibility for his error and Dr. Alexander attempted to evade responsibility for the wilful misconduct of which the hospital believed he was guilty, Dr. Britt is not similarly situated to Dr. Alexander.

### (2) *Dr. Taxman*

Dr. Alexander alleges he is also similarly situated to Dr. Taxman. In 1984, Dr. Taxman did not respond to a page while on call. Dr. Taxman did not respond, it turned out, because he was caught in heavy traffic in Chicago. (Pl.'s 12(n) Stmt., Ex. N (letter from MEC to Taxman noting that Taxman was "unavailable to respond" to a page because he was in the city); Def.'s Reply to Pl.'s 12(n) Stmt., Ex. C (note of Ralph Hutchins, President of the MEC, re: a telephone call from Dr. Taxman stating "no way he could get to the hospital")) Like Dr. Britt, Dr. Taxman did not voluntarily refuse a request for assistance. Rather, he, perhaps negligently, posited himself in a position from which he could not adequately respond to such a request. Dr. Alexander has not controverted this explanation. Because his error stems from carelessness, it also differs from Dr. Alexander's intentional refusal. As such, Dr. Alexander is not similarly situated to Dr. Taxman.

### (3) *Dr. Friedman*

Dr. Alexander avers that he is similarly situated to Dr. Friedman. On two occasions, Dr. Friedman "refused to respond to ... calls from the Emergency" Room. (Pl.'s 12(n) Stmt., Ex. O; Def.'s Reply Br. at 12 n. 6) The hospital suspended Dr. Friedman, and Dr. Friedman resigned shortly thereafter. (Def. Reply Br. at 12 n. 6) Rush avers that Friedman did not refuse to respond to a call for assistance from a doctor who current-

ly was treating a patient, but rather, that he refused to return the phone calls of emergency room personnel who wished to schedule him for the on-call roster. (*Id.*)

If this explanation is accurate, then Drs. Alexander and Friedman are not similarly situated. Dr. Friedman allegedly refused to be placed on the on-call roster. Thus, unlike Dr. Alexander's refusal to assist a specific patient, Dr. Friedman's misconduct would not have endangered a patient's welfare. Rush cannot be considered to have acted unreasonably or arbitrarily because it differentiated between misconduct that endangers a person and misconduct which does not. *See Johnson v. Artim Transp. Sys. Inc.,* 826 F.2d 538, 544 (7th Cir.1987), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988). As such, Dr. Alexander would not be similarly situated to Dr. Friedman.

Rush, however, has failed to show the court that no genuine issue exists with respect to the facts Rush has averred. Rush attributed its assertion that Dr. Friedman only refused to be placed on the on-call roster, rather than refused a specific request to go to the hospital, to Dr. Chervony. (Def. Reply Br. at 12 n. 6 (citing Dep. of Chervony at 26–27)) Yet Dr. Chervony testified that he did "not remember that [Dr. Friedman] refused to come to the emergency room." (Dep. of Chervony at 26–27) Rush cannot demonstrate the nonexistence of a genuine issue of material fact by simply noting that one person does not remember it being to the contrary. *Smith v. Joliet,* 965 F.2d 235, 238 (7th Cir.1992) (plaintiff did not establish a genuine issue of material fact as to whether the police department received excessive force complaints by merely presenting the deposition of an officer who did not remember the absence of complaints); *Unterreiner v. Volkswagen of Am., Inc.,* 8 F.3d 1206, 1210 (7th Cir.1993) (party does not present a genuine issue of material fact by submitting affidavits which purport to establish a given fact if the affiant admits that his memory is faulty). Thus, Rush has failed to show that Dr. Friedman is not similarly situated to plaintiff.

#### (4) *Dr. Abrams*

Dr. Alexander also alleges he is similarly situated to Dr. Bernard Abrams. In 1986,

Dr. Abrams failed to respond to a call when he was the on-call surgeon. (Pl.'s Resp. Mem. at 3; Ex. I to Pl.'s 12(n) Stmt.) As a result, the hospital suspended his staff privileges. (*Id.*) Five days later, when Dr. Abrams noted that the hospital may have violated Dr. Abrams' due process rights by suspending him without notice, Rush reinstated his privileges. (*Id.*) Dr. Abrams then discussed the episode with Rush; his version "differed from the allegation" the hospital received. (*Id.*) The hospital advised Dr. Abrams that a proper response to an emergency room call included a trip to the hospital to at least assess the patient. (*Id.*) Rush then concluded "no further suspension was deemed necessary." (*Id.*) Thus, when Dr. Abrams failed to respond to a call, Rush suspended him, and for only five days.

In response, Rush merely contends "if Dr. Alexander seeks to avoid summary judgment by arguing that he was treated differently than Dr. Abrams, it is his burden to offer facts which show that he and Dr. Abrams were similarly situated." (Def.'s Reply Br. at 10 (citing *St. Mary's Honor Ctr. v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993))) Yet Dr. Alexander has produced uncontroverted evidence from the hospital describing Dr. Abrams' misconduct as a "failure to respond." (Pl.'s 12(n) Stmt., Ex. I) Interestingly enough, the hospital termed Dr. Alexander's misconduct failure to "appropriately" respond. (Pl.'s 12(n) Stmt., Ex. U) The court cannot conclude that "failure to respond" implicates different misconduct from that of failure to "appropriately" respond. Moreover, with respect to the aforementioned two incidents, Rush presented evidence and explanation as to how each doctor's "failure to respond" was distinguishable from Dr. Alexander's "failure to respond." (Def.'s Reply Br. at 12 (arguing that failure to respond differs if it involves negligence as opposed to intentional wrongdoing)) With respect to Dr. Abrams, however, Rush has neglected to provide any explanation for distinguishing the two.

On a motion for summary judgment, the moving party has the initial burden of demonstrating that no genuine issue exists as to a material fact. *Celotex Corp. v. Catrett,* 477

U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Here, Rush has failed to meet this burden. The precise character of Dr. Abrams' "failure to respond" is a material fact as his "failure to respond" may be comparable to that of Dr. Alexander; thus, this incident could demonstrate that Rush treated a similarly situated caucasian doctor differently than it treated an Egyptian doctor of the Muslim faith.

In summary, a genuine issue of material fact exists as to whether Drs. Abrams and Friedman were similarly situated to Dr. Alexander. No genuine issue exists with respect to Drs. Britt and Taxman, and accordingly, the hospital's motion is granted to this extent. *See* FED.R.CIV.P. 56(d). At trial, Dr. Alexander may not attempt to show a *prima facie* case by presenting evidence regarding the infractions of Drs. Britt and Taxman.

### CONCLUSION

For the foregoing reasons, the court grants Rush's motion for summary judgment with respect to the similarity of Dr. Alexander to Drs. Britt and Friedman and with respect to the honesty of Rush's belief in Dr. Alexander's misconduct. The issue that remains for trial is the comparability of Dr. Alexander's misconduct to that of Drs. Abrams and Taxman and the resulting sanctions imposed by Rush.