**Fernando CREDO, Plaintiff,**

v.

**ZEMA SYSTEMS CORPORATION, a Delaware corporation, doing business as Chicago Beverage Systems, Inc. and Coors Distributing of Illinois, Defendant.**

No.  95 C 5757.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 12, 1996.

Christopher T. Hurley, Mark R. McKenna, Christopher T. Hurley & Associates, P.C., Chicago, IL, for Fernando Credo.

Roger J. Guerin, Christopher G. Walsh, Jr., Robin Korman Powers, Rothschild, Barry & Myers, P.C., Chicago, IL, for Zema Systems Corporation, Chicago Beverage Systems, Inc.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiff Fernando "Frank" Credo (Credo) alleges that his former employer, Zema Systems Corp. d/b/a Chicago Beverage Systems, Inc. (CBS), violated Title VII, the Age Discrimination in Employment Act and 42

U.S.C. § 1981 when it terminated him in November 1994. Credo, a Pacific Islander, was born in the Philippines and was 56 years old at the time of his termination.

## I. BACKGROUND

CBS is a wholesale distributor of beer and other malt beverages in the Chicago area. Kurt Menick, the controller of CBS' accounting department during Credo's tenure, hired Credo as a cashier in October 1984, when Credo was 46 years old. Menick promoted Credo to head cashier in 1986. There are four cashiers, including the head cashier, who are considered part of the accounting department. During the relevant period, the accounting department consisted of: the controller, the head cashier and three additional cashiers, inventory/accounts receivable clerk, accounts payable clerk, accounting supervisor and accounting clerk. The cashiers are required to work overtime on a regular basis because one of their job requirements is to wait for the beer delivery drivers to return from their routes. They often do not get off work until 1 or 2 a.m. The parties do not dispute that all cashiers, including plaintiff, received time and a half for overtime work. At least four cashiers other than plaintiff were Filipino.

Plaintiff received two more promotions while at CBS; to inventory clerk in 1987 and to accounts payable clerk in 1989. Other than cashiers, employees in the accounting department generally work between 8 a.m. and 5 p.m. When plaintiff was promoted to inventory clerk, Menick told him that he should be able to complete his job duties without overtime being necessary. The non-cashier members of the accounting department did occasionally work late when Menick asked them to complete special assignments with time constraints. Menick and Andy Balonek, the accounting supervisor, testified that they did not get paid overtime when they worked late. Nelson Teruel, the inventory clerk, and Leo Rokicki, the accounts receivable clerk who replaced Credo as the accounts payable clerk, testified that they did receive overtime pay when they worked late. Menick, Balonek and Rokicki are white; Teruel is Filipino.

Because he wanted to earn extra money, plaintiff asked Menick if he could work extra hours on a regular basis. Menick testified that he and plaintiff agreed that plaintiff would work after hours on special non-urgent projects for regular pay. The projects included increasing deposits and reviewing procedures in the cashiering department. Plaintiff agreed that he requested permission to work additional hours and that he told Menick the arrangement was fine with him. He denied that his agreeing to work at a straight time rate was voluntary because he felt that he was required to complete these special projects. Other than the cashiers, plaintiff was the only person in the accounting department who worked more than 200 hours of overtime a year. Rokicki testified that although the accounts payable position now includes more duties than it did when plaintiff held it, he works only an average of five to eight hours of overtime a month.

The parties dispute to what extent plaintiff had supervisory control or responsibility over the cashiers. Plaintiff denies that he supervised the cashiers. Menick stated that officially, the cashiers reported to him or Andy Balonek, the accounting supervisor. Manuel Erese, the head cashier, oversaw the other cashiers' day-to-day duties. Menick admitted that the accounts payable clerk had no official role as to the cashiers but that unofficially the cashiers knew they could go to Credo with any problems. He stated that he sent Credo into the cashier box on a daily basis to resolve problems. Menick assigned Credo these responsibilities because he could speak the same dialect as the rest of the cashiers and Menick felt it was easier to communicate with the cashiers through Credo. Credo did not hire new cashiers, discipline or fire cashiers or set their schedules and he did not work in the same room as they did. Balonek described Credo's job as a mediator between the cashiers and Menick and that it was "probably due to nationality. Maybe a language barrier." He also stated that Credo's supervision of the cashiers was informal and that he supervised Credo and was present when Menick terminated him. Balonek and Menick were both unaware that Maloney had been cashing large checks.

Plaintiff agreed that he generally went into the cashiers' box at Menick's direction once a day to resolve problems but stated that other employees went into the box as often as he did. Plaintiff testified that the cashiers considered Menick their boss. At the time of plaintiff's termination, all of the cashiers were Filipino and plaintiff spoke to them in both English and Tagalog. Rokicki, plaintiff's replacement, did not assume any responsibility over the cashiers when he took over the accounts payable position. This responsibility remained with Balonek, whom Menick described as the official supervisor of the cashier department.

Three out of the four cashiers who were employed when Credo was terminated testified that he had not been their supervisor.[1] August Calimbas, a cashier who was promoted to head cashier after Erese was terminated, stated that Balonek had been his supervisor both before and after Credo was fired. He said that if Menick had instructions for the cashiers, Balonek would relay the information to them and Credo performed this duty only if Balonek was not available. Cashier Renato Zubieta stated that he never went to Credo if he was having a problem in the cashiering department, he went to Menick. The last cashier, Nore Borillo, stated that only Erese and Menick had authority over the cashiers.

Several employees, including plaintiff and Menick, testified that they had heard the term "coconuts" used to refer to Filipino employees. Plaintiff stated that Menick called him the "head coconut" and that he himself referred to the cashiers as the "coconuts" in conversations with Menick. Menick stated he had not used the term "coconuts" and that plaintiff was the only person he remembered who commonly used it.

On November 4, 1994, Menick asked Credo to look into a $50 debit memo that Menick had received from the bank. It indicated that one of the bills CBS had deposited was counterfeit. Credo left Menick's office and went to the cashiers' cage to look into the matter. He stated that when he asked

Erese about the debit memo, Erese told him that the counterfeit bill had come from Terry Maloney, the inventory clerk. When plaintiff questioned why Maloney had given the cashiers a counterfeit bill, Erese told him that it was part of the cash that he had given Maloney when Maloney cashed a personal check at the cashier window. When Maloney discovered it, he returned it to the cashiers. At this point, Erese informed plaintiff that Maloney's personal check had been for $37,000 and that Maloney had been cashing checks at the window almost every day for several months. The amount of the checks had started out small and had grown progressively larger. Erese told plaintiff that the cashiers kept cashing Maloney's checks because they had never bounced. Plaintiff stated that before this conversation, he had not known about the large number of checks Maloney had been cashing. All the cashiers had been cashing checks for Maloney for about nine months. They had large amounts of cash available because on a busy night, the cashiers might collect as much as $70,000 in cash from the drivers.

Approximately five minutes after he left it, Credo returned to Menick's office. Menick stated that plaintiff informed him that the preceding evening, Maloney had come into the office and cashed a personal check for $37,000. Credo did not tell Menick that he was present during this transaction. When Menick asked plaintiff why the cashiers had allowed Maloney to cash such a large check, plaintiff said that they had been doing it for months and that no check had ever bounced. Plaintiff stated that when Menick asked him why no one had told him of this, plaintiff told him that he had just found out about the checks himself.

Menick told Credo to leave his office and he called Maloney in to discuss the situation. Ray Guerin, president of the company, was also present during this meeting. Maloney explained that because of personal financial problems, he had been floating checks for several months and had in that week alone cashed three checks for more than $30,000

---

1. There is no testimony from Erese, the head cashier who was terminated at the same time as plaintiff.

each. Guerin and Menick suspended Maloney pending further investigation and had him escorted from the building.

After the meeting with Maloney, Menick held a meeting with the cashiers and Credo and told them that they could not cash employees' personal checks that exceeded $200 without Menick's approval. He testified that an "understood" policy had always existed that employees were not allowed to cash checks for more than $200 at the cashier window. Calimbas stated that he was not aware of such a policy before the incident with the $37,000 check. Rokicki and Zubieta also testified that the policy was implemented after the incident. Although there is disagreement over whether an official policy existed that limited the check amount employees could cash to $300, it appears clear that cashiers would go to Menick, not plaintiff, for permission to cash a large check.

On Monday morning, Menick met with Guerin and Chris Reyes, CBS' current president, to determine what disciplinary action they would take. They agreed that Maloney should be terminated for cashing the checks and Erese and Credo should be terminated for allowing Maloney to cash the checks and for not bringing the matter to Menick's attention. Menick did not believe that there was any collusion between Maloney and the cashiers or Credo but that they had exercised bad business judgment by allowing Maloney to cash the checks. In the meeting with Credo, Menick informed him that he was being terminated because he could no longer trust his business judgment because he had failed to recognize the nature of the problem and bring it to Menick's attention. Menick stated that Credo never told him that he had not known about the check-cashing practice and that Credo indicated that he did know the checks were being cashed. Menick did not investigate whether any other accounting personnel, including Balonek, knew about the check cashing. He stated that there was no other reason for plaintiff's termination except the check-cashing incident.

Menick terminated plaintiff, Erese and Maloney. There is no dispute that plaintiff's work performance was not at issue and that the only reason for termination was the loss of trust based on this incident. The check for $37,000 eventually bounced and CBS has not recouped all of the money from Maloney. Plaintiff denies that he knew the cashiers were cashing such checks before that day. Although CBS disputes plaintiff's assertion that he did not know about the check cashing before November 4, the employee testimony it cites to support this assertion indicates that the employees had no first-hand knowledge that plaintiff knew of the scheme and merely based their beliefs on supposition and conjecture. CBS claims that Calimbas testified that plaintiff knew about the scheme but a review of his deposition testimony reveals that, at best, he was unsure. Plaintiff submitted affidavits from Maloney and several cashiers in which they stated that plaintiff was not present when the checks were cashed and did not know that the cashiers had been cashing large checks for Maloney on a regular basis.

Rokicki took over plaintiff's position as accounts payable clerk at a salary of $29,000. He currently earns $30,500. At the time of his termination, plaintiff was earning $32,500 a year. Rokicki stated that he receives overtime pay and works approximately five to eight hours of overtime a month. In addition to the duties plaintiff performed as accounts payable clerk, Rokicki handles promotional allowance billing, certain accounts receivables, and liquor taxes.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993). The court must believe the evidence of the non-moving party and construe the evidence in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of an individual's race." 42 U.S.C. § 2000e–2(a)(1). Under § 1981, the right to make and enforce contracts without regard to race includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The ADEA prohibits the discharge of an employee based on age if the employee is at least 40 years old. 29 U.S.C. §§ 623(a)(1), 631(a).

The parties agree that plaintiff is not offering direct evidence of discriminatory intent and that his claims under Title VII, ADEA and 42 U.S.C. § 1981 are all analyzed according to the *McDonnell Douglas* burden-shifting paradigm. To establish a prima facie case of either wage, race or age discrimination, plaintiff must establish that: (1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) he was treated less favorably than members outside his classification. *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir. 1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If plaintiff meets the requirements of each prong, the burden shifts to the defendant to provide evidence that the adverse employment decision had a legitimate, nondiscriminatory motive. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). If the employer does so, plaintiff must persuade the trier of fact that the employer's purported reason is pretextual. He may do so either with direct evidence of discrimination or indirectly by proving that (1) defendant's explanation has no basis in fact, (2) the explanation was not the real reason for the discharge, or (3) the reason stated was insufficient to warrant the discharge. *Lenoir*, 13 F.3d at 1133.

### A. Wage Discrimination

In his complaint, plaintiff alleged that CBS discriminated against him based on race and national origin by paying him less than they paid his replacement, who is white. Plaintiff asserts that he was treated less favorably than members outside his classification because Rokicki, his replacement, was a "less qualified and experienced Caucasian who was immediately paid more than plaintiff was on his termination date." It is undisputed that Rokicki received a lower salary at the time he took over the accounts payable position than plaintiff did at the time of his termination. The court finds that as to plaintiff's replacement, plaintiff has failed to establish that Rokicki was treated more favorably than he was. *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 338 (7th Cir.1993). Also, because the accounts payable position now includes additional responsibilities, plaintiff cannot show that he and Rokicki are similarly situated. *Id.*

Plaintiff's second allegation of wage discrimination is that CBS refused to pay him time-and-a-half for overtime work when non-Filipinos did receive time-and-a-half. All cashiers, whether Filipino or non-Filipino, receive time-and-a-half for overtime. Plaintiff does not dispute that he received time-and-a-half for overtime when he worked as a cashier. Instead, plaintiff argues that after his promotion to a non-cashier accounting position, he did not earn overtime pay when white employees in non-cashier accounting positions did earn overtime pay.

The record indicates that Credo went to Menick in 1987 and requested the opportunity to work additional hours. Menick told Credo that his position did not generally require overtime and if he wanted to work extra hours on special projects, he would have to do so at straight time. Plaintiff worked many more hours of overtime than any other employee in accounting besides the cashiers. Menick stated that he paid accounting personnel overtime if he asked them to work on urgent projects that required them to stay late. Rokicki, his replacement, performs additional duties in the accounts payable position and still only works an average of five to eight hours of overtime a month. The court finds that plaintiff has not established a prima facie case because he has

not proved that he was similarly situated to the other non-cashier accounting clerks. *Lenoir*, 13 F.3d at 1132. Plaintiff has not established that he was not paid overtime for time-pressured assignments that had to be performed after regular business hours. No other accounting personnel asked to work extra hours or was assigned non-urgent projects on a regular basis as an opportunity to earn extra income.

Also, plaintiff has failed to establish that CBS treated non-Filipinos more favorably than it treated Filipinos. Nelson Teruel, a Filipino, testified that he received overtime pay in his position as a non-cashier accounting clerk. Because the group of employees who received overtime pay includes members of plaintiff's own classification, he is unable to prove that the distinction was based on race or national origin. *Id.* Defendant's motion for summary judgment as to plaintiff's wage discrimination claims under Title VII and 42 U.S.C. § 1981 is granted.

### B. Termination

Defendant claims that plaintiff cannot establish a prima facie case as to his termination because his failure to inform Menick of the checking-cashing scheme made him unqualified for his position. Therefore, as he is unable to prove that he performed his job satisfactorily and was meeting his employer's legitimate expectations, he cannot prove the second prong of the *McDonnell Douglas* test.

Because there is no dispute that plaintiff's discharge was not based on his overall performance but rather on a specific incident, CBS' proffered reason for discharge fits more logically into the *McDonnell Douglas* framework as a legitimate, nondiscriminatory motive for his termination. *See Lenoir,* 13 F.3d at 1133 (court considered termination for fighting as legitimate, nondiscriminatory reason instead of as affecting plaintiff's prima facie case or qualifications). The question is whether Credo has created a genuine issue of material fact concerning CBS' proffered reason for discharge.

CBS states that it had a legitimate, nondiscriminatory reason to terminate plaintiff because after Menick learned of the check-cashing practices, he no longer trusted Credo or believed he had good business judgment. It asserts that "CBS was angry that a check-kiting scheme had been perpetrated in its Accounting Department for nine months, and plaintiff was held partially responsible for the length of time for which the scheme went unnoticed." Although plaintiff maintains that he did not know about the check-cashing scheme, defendant responds that even if this is true, it is irrelevant to plaintiff's attempts to establish pretext. As long as Menick believed that plaintiff, as the cashiers' supervisor, knew or should have known that the checks were being cashed, it constitutes a legitimate, nondiscriminatory reason even if erroneous. An employee's misconduct, "even if simply perceived rather than real, is justification for termination." *Palmer v. Circuit Court of Cook County Social Service Department,* 905 F.Supp. 499, 504 (N.D.Ill.1995) (internal quotes omitted). The only concern is whether "the employer honestly believes in the reasons it offers." *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992).

Incorporated into its argument that Menick honestly believed that plaintiff "knew or should have known" about the check-kiting scheme is CBS' contention that plaintiff was the cashiers' supervisor. Credo does not argue with CBS's statement that the cashiers' supervisor should have been aware of the problem and could be held responsible for not knowing. Instead, Credo denies that he was the cashiers' supervisor and notes that the cashiers' actual supervisor was not disciplined in any way for failing to discover or report the check-kiting scheme.

Menick and Balonek stated that plaintiff served as the cashiers' "unofficial" supervisor. To support this, CBS points to testimony that plaintiff was a former cashier himself who could answer cashiers' questions, he visited the cashiers' area once or twice a day, and Menick regularly requested plaintiff's help in solving problems in the cashier department and viewed plaintiff as his liaison with the cashiers. This contact purportedly gave plaintiff the "reason and opportunity" to know of the scheme.

CBS' assertion that plaintiff was the cashiers' supervisor was contested by every witness who testified, including to a certain extent Menick and Balonek. They admitted that supervisory responsibilities as to the cashiers were unrelated to the accounts payable position. Plaintiff did not have the power to hire, fire or discipline cashiers. He did not review their work or monitor their day-to-day tasks. All of the cashiers testified that plaintiff was not their supervisor and that they did not seek out his help if they had a question. CBS maintains that plaintiff was the only former cashier to whom cashiers could turn with questions, but the cashiers stated that they went to Menick or the head cashier for assistance. One stated that plaintiff acted as Menick's intermediary only when Balonek was not available to do so.

■ Although CBS points to Menick's directing plaintiff to investigate the $50 debit memo on the day of his termination as evidence that he performed supervisory duties, this indicates that his troubleshooting was done on an assignment basis. At most, it appears that plaintiff acted as an intermediary or interpreter when Menick had a specific problem in the cashier department. As Menick conceded that plaintiff performed none of the duties traditionally belonging to a supervisor, a genuine issue of material fact exists as to whether plaintiff actually was a supervisor. Without this, CBS' reason for termination collapses because it is based on the contention that plaintiff was a supervisor. *Sarsha,* 3 F.3d at 1042.

■ Plaintiff also argues that even if he acted as an unofficial supervisor and failed to discover the check-cashing scheme, the cashiers' official supervisor was not terminated or disciplined for failing to discover it. Even when an employer has a legitimate, nondiscriminatory reason for termination, an employee can create a genuine issue of material fact if he shows that similarly situated employees who committed the same or more serious infractions were not subject to discipline. *See Alexander v. Rush North Shore Medical Center,* 851 F.Supp. 330, 333 (N.D.Ill.1994) (citing *Lenoir* ); and *Palmer v. Circuit Court of Cook County Social Service Department,* 905 F.Supp. 499, 504 (N.D.Ill. 1995) (issue was whether employer treated similarly situated insubordinate employees differently). According to Menick, Balonek was the official supervisor of the cashiers during plaintiff's tenure and currently acts as their immediate supervisor. Rokicki has no supervisory responsibilities as to the cashiers in the accounts payable position.

■ The question is why Menick placed the "knew or should have known" burden on plaintiff when he did not require the same of Balonek. The distinction is troubling considering the explicit reason Menick and Balonek gave for plaintiff's appointment as "unofficial" supervisor: "probably due to nationality. Maybe a language barrier." Neither Menick nor Balonek, who both supervised the cashiers and had regular contact with them, knew about the check-cashing scheme. Nevertheless, Menick allegedly decided that plaintiff must have known or should have known that the cashiers were cashing large checks for Maloney. As plaintiff points out, expecting him to be the spokesperson or contact person for all Filipino employees might place an unfair burden on him that could arguably be related to his nationality.[2] Plaintiff has established that a genuine issue of material fact exists as to why Menick treated plaintiff—at most an unofficial supervisor—differently than he did the cashiers' official supervisor. *Alexander,* 851 F.Supp. 330.

■ CBS also claims that Menick had a legitimate reason to terminate plaintiff because he simply believed plaintiff had known of the check kiting all along and failed to

---

2. Plaintiff points to Menick's use of the term "coconuts" in reference to the Filipino employees as evidence that he harbored discriminatory intent against them. Menick denied using the term. Even if the court accepted the evidence for the sake of argument, "a supervisor's occasional or sporadic use of a slur directed at an employee's race, ethnicity, or national origin is generally not enough to support a claim under Title VII." *Hong v. Children's Memorial Hospital,* 993 F.2d 1257, 1266 (7th Cir.1993). Plaintiff has not established a nexus between any such remarks and Menick's decision to terminate him. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993).

inform him of it. Although a genuine issue exists as to this rationale because it is also based on plaintiff's status as a supervisor, plaintiff additionally refutes the basis for Menick's belief. Credo testified that during the meeting in Menick's office he stated that he had just found out about the checks. Menick testified that plaintiff indicated that he had known about the check-cashing practice all along, which was why he decided to terminate him. Menick did not ask the cashiers or Maloney whether plaintiff had been involved in or informed of the scheme. Although plaintiff cannot establish pretext by claiming Menick made a mistake about his involvement or knowledge, he can do so by creating a genuine issue as to what he and Menick actually discussed. *See Sarsha*, 3 F.3d at 1041. Menick supported his belief that plaintiff knew of the scheme on plaintiff's demeanor and statements during their meeting. Plaintiff specifically refuted Menick's description of their conversation by asserting that he told Menick he had not known about the scheme. This is different from arguing that Menick was simply mistaken in believing that plaintiff had known about the checks. The parties' different descriptions of the conversation that formed the basis of Menick's decision makes "this a case of one party's word against another." *Sarsha*, 3 F.3d at 1041. Summary judgment is inappropriate when credibility is at issue. *Id.*

■ To support its assertion that Menick's belief that plaintiff knew all along was reasonable, CBS points to the testimony of several other employees who stated that Credo "must have known" about the. scheme. First, as the court previously noted, a review of the testimony reveals that the other employees' assumptions that plaintiff was aware of the check cashing were not based on first-hand knowledge. Second, the issue is what Menick honestly believed at the time he terminated plaintiff. He admitted that he had not questioned other employees about plaintiff's involvement in or knowledge of the scheme before terminating him. CBS cannot now rely on information collected after the termination to establish what Menick honestly believed at the time he made his decision. *McKennon v. Nashville Banner Publishing*

*Co.*, 513 U.S. 352, ——, 115 S.Ct. 879, 885, 130 L.Ed.2d 852 (1995).

■ As a final matter, CBS claims that plaintiff's ADEA claim should be dismissed because he admitted that he had no facts to support his claim of age discrimination. Plaintiff established a prima facie case as to his race, national origin and age claims. Although plaintiff offered no direct evidence of discrimination, a genuine issue of fact exists as to CBS' legitimate, nondiscriminatory reason for termination, which it proffered as to all claims. Although a jury may disbelieve an employer's proffered reason for discharge and still conclude that discrimination did not occur, this does not allow a court to dismiss the case at the summary judgment stage. Nor does it require plaintiff to submit additional evidence to prove discrimination. The ultimate question of whether discrimination occurred remains a question of fact for the jury. *Sarsha v. Sears, Roebuck & Co.*, 1994 WL 46701 (N.D.Ill.) (discussing *Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

## III. CONCLUSION

Plaintiff has shown more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Therefore, the court denies CBS' motion for summary judgment on plaintiff's discriminatory termination claims under Title VII, ADEA and § 1981.

For the foregoing reasons, defendants' motion for summary judgment is granted as to the wage discrimination claims and denied as to the termination claim.

ORDERED: Defendants' motion for summary judgment is granted in part and denied in part.